239 N.J. Super. 601 (1990)
571 A.2d 1349
JOHN McCANN, PLAINTIFF-APPELLANT,
v.
ARTHUR I. LESTER, M.D., DEFENDANT-RESPONDENT, AND MARK LEVY, M.D., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 15, 1990.
Decided March 21, 1990.
*602 Before Judges GAULKIN, DREIER and SCALERA.
Larry L. Leifer argued the cause for appellant (Larry L. Leifer, on the brief).
Marjorie Gilman Baker argued the cause for respondent (Dughi & Hewit, attorneys; Marjorie Gilman Baker and Christopher J. Christie, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*603 Plaintiff, John McCann, appeals from the granting of defendant's new trial motion at the end of the first of two trials in this medical malpractice case. He also seeks to have the verdict in the second trial set aside due to various allegedly prejudicial and erroneous trial rulings. As we are reversing the initial granting of defendant's new trial motion, we will but briefly comment on the alleged errors in the second trial.
Through 1981, McCann, in his words, suffered from "severe pain on the right side of my head.... I was also having trouble with my eyesight and ... was real irritable." Plaintiff further stated that at times the symptoms became so severe, "I could hardly function. I was dizzy, kept feeling as though I was going to pass out ... I could barely get up." Seeking relief, McCann met with defendant Arthur I. Lester, M.D. After taking x-rays and hearing the symptoms, he diagnosed frontal sinusitis and recommended surgery. Of note in the plaintiff's history was his smoking habit since about the age of 16 (between one-half a pack and a pack per day), his use of marijuana throughout his youth, and later occasional use of cocaine. Although plaintiff admits only to a limited use of cocaine, some of the medical records suggest a possible serious substance abuse problem. Dr. Lester claims he advised McCann not to smoke, and not to use drugs.
In April 1981, Dr. Lester performed a trephination, a procedure whereby the sinus is drained. Following the procedure, McCann noticed a marked improvement in his condition. He also quit smoking for six months. However, about four weeks following the procedure, his earlier symptoms returned, and a second trephination was performed in May of 1981. This second procedure, however, provided no relief of plaintiff's symptoms.
Dr. Lester next proposed an operation, an osteoplastic flap, whereby fat was to be removed from the stomach and placed in the frontal sinus to prevent air from going into it. Dr. Lester, *604 then incapacitated due to an accident, was unable to perform the operation and McCann consulted defendant Mark Levy, M.D. Dr. Levy also proposed an osteoplastic flap, and while the patient was under anesthesia, elected to drill a hole from the right sinus into the left sinus in order to improve drainage. This operation also failed to relieve the plaintiff's symptoms, and in fact, after this operation, the swelling in his face increased.
McCann returned to Dr. Lester's care and on a subsequent readmittance to the hospital, had a new sinus trephination and an osteoplastic flap procedure. Thereafter, however, he still suffered from severe head pain and flu-like symptoms. About this time, McCann learned of the risk of osteomyelitis. According to plaintiff's expert, this is a disease "that involves now, not only the cavities of the sinuses but the thickness of the bone itself, all of the marrow ... within the bones becomes diseased."
After numerous other hospital stays, in 1984 McCann was admitted to Mt. Sinai Hospital in New York City, where a sinus obliteration procedure was performed. In this procedure, a bone was removed from McCann's forehead. Although he has felt better after this procedure, between March 1982 and August 1984 McCann had 21 separate hospital stays for chronic sinusitis, osteomyelitis, depression and anxiety. He also spent nearly one month at Johns Hopkins for pain management and addiction to pain-killing drugs.[1]
On February 3, 1986, McCann filed a complaint against Drs. Lester and Levy,[2] alleging malpractice. Plaintiff contended at his first trial that he had been misdiagnosed and negligently treated; he also hoped to show that his condition stemmed from allergies, perhaps to cigarette smoke, and that Dr. Lester failed to account for this. Although defendants made a motion for *605 the judge to charge the jury that plaintiff's taking drugs and smoking was wanton and willful conduct, barring plaintiff's claim, the motion was denied.
It is the polling of the jury, however, allegedly evincing a flaw in its deliberations, that constitutes one of two central issues in this controversy. After returning with a verdict, the foreman was asked:
THE CLERK: How did you answer question number one which asks, `Was the defendant Dr. Lester negligent?'
THE FOREMAN: Yes.
THE CLERK: Was that answer unanimous?
THE FOREMAN: Yes.
The complete verdict found no cause for action against Dr. Levy, Dr. Lester to be 60% negligent, 40% contributory negligence against the plaintiff, and a total damage evaluation of $400,000.
Prior to the judge's dismissing the jury, the jurors were polled. In response to the question of Dr. Lester's negligence, five of the jurors found that he was, and one, James Deluce, that he was not. The jury was then asked if the defendant's negligence was a proximate cause of the plaintiff's injuries. Again five of the jurors answered yes, but this time Mr. Deluce stated: "I did not answer based on my answer being no to the first answer." In answer to the question whether plaintiff was negligent, five answered yes, and Deluce responded:
Again, I didn't answer that because my answers to one and three were both no. But if required to answer my answer would be that's number five in terms of the plaintiff's; that would be yes. No answer then.
To the remaining questions, Mr. Deluce essentially responded: no answer. The jury was then discharged.
After the discharge of the jury, defendants made a motion for a new trial based on less than "a full deliberation by all jurors on all questions," and "that it was error not to give the jury the charge that ... plaintiff's conduct was willful and wanton... and that upon such a finding that the plaintiff would be barred." The judge ruled that

*606 despite defendant's failure to object. The failure to participate in deliberations, I feel, is a nullification of the verdict.
Further, I also find error in my failure to instruct the jury that under the law of New Jersey, if they determined the plaintiff acted willfully, wantonly or recklessly, he was barred from recovery.[3]
A second trial began before a different judge, with Dr. Lester as the only defendant. This trial resulted in a finding of no cause for action against Dr. Lester. Plaintiff has also appealed six separate trial rulings of the second judge; but, as we have noted at the outset, in light of our rulings concerning the first verdict, the issues raised are moot.

A
This case presents the issue whether a six-person civil jury may render a verdict through the deliberations and then unanimous conclusions of five of the jurors, with the apparent non-participation of the sixth juror on some of the issues, or with his participation but refusal to vote. The New Jersey Constitution permits a civil verdict to be rendered by five-sixth vote. N.J. Const. (1947), Art. I, par. 9; N.J.S.A. 2A:80-2; R. 1:8-2; R. 1:8-9. Furthermore, R. 1:8-2(c) provides:
If a jury of 6 is impanelled and sworn, the parties shall be deemed to have stipulated that in the event one juror is excused, the trial shall proceed and a verdict may be rendered by 5 of the jury agreeing, unless at the time the jury was drawn, any party by statement on the record refuses to so stipulate.
This case can be readily distinguished from Williams v. James, 113 N.J. 619, 552 A.2d 153 (1989), decided months after the first trial in this case. In fact some of the principles stated in Williams directly support the conclusion that the verdict rendered in the case at bar is not infirm. In Williams, the Court examined the question whether a juror who found no negligence and thus disagreed with the majority of the jury, should still deliberate and vote on the issue of allocating percentages of fault between the parties he personally felt were *607 not at fault. Id. at 621, 552 A.2d 153. The plaintiff in that case asserted that the juror who disagreed with the finding of negligence should be precluded from deliberating and voting on the apportionment-of-fault issues. Id. at 623, 552 A.2d 153. There, however, only four of the remaining five jurors agreed on the apportionment of fault, and the verdict thus would have been rendered infirm without the dissenting juror's participation. Ibid. The Court did, however, emphasize the importance of six jurors in the deliberative process. The Court noted, "[m]ore important than consistency as such is the effective involvement of all jurors in all important issues." Id. at 626, 552 A.2d 153. The Court then went on to state:
What is, however, critical in this approach is that an outvoted juror will honestly and fairly examine the remaining issues. We therefore consider it essential that jurors be properly instructed. They must be told clearly and emphatically that each juror must deliberate fully and fairly on each question or special verdict, that inconsistency on the determination of one question or verdict does not disqualify a juror from deliberating on remaining questions, and that any juror must, in deliberating on any remaining question or verdict, accept the position of the majority on any previous question or verdict and do so honestly, fairly, and conscientiously.
* * * * * * * *
In sum, the strong public policies favoring application of the Ward approach surmount any countervailing considerations behind previous unanimity requirements. The crucial consideration is preserving the integrity of the deliberative process by ensuring that each juror understands clearly his or her responsibility to participate fully in determining each issue. This rule grows out of the public policy considerations behind the legislative adoption of non-unanimous jury verdicts, namely, to promote judicial efficiency and economy while maintaining a structure for full participation in collective decision-making. [Id. at 632-634, 552 A.2d 153, citing to Ward v. Weekes, 107 N.J. Super. 351, 353, 258 A.2d 379 (App.Div. 1969)].[4]
In the case before us we do not have the problem that existed in Williams, namely that a dissenting juror, not properly instructed concerning the extent of his participation, was part of a necessary five affirmative votes for any of the liability, *608 proximate cause or damage questions decided by the jury.[5] There is, however, a consideration present in our case that was not discussed in Williams. We do not know from the colloquy with Mr. DeLuce whether or not he actually participated in the discussions following his disagreements concerning Dr. Lester's negligence. We therefore must look at this verdict in the alternative. If Mr. DeLuce in fact participated fully, his vote is of no moment, since the five votes were properly recorded in favor of the 60/40 liability verdict and the $400,000 damage verdict. Although Mr. DeLuce may not have been given the charge now required by Williams, Mr. Deluce's vote was not necessary to the verdict.
Treating the other alternative, namely that Mr. DeLuce withheld himself from discussions following the initial vote concerning Dr. Lester's liability, we essentially are faced with the deliberation by a five-person jury. Defendant withheld any objection to the return of the verdict until the motion for a new trial, long after the error, if any, could have been easily corrected. See Roland v. Brunswick Corp., 215 N.J. Super. 240, 245, 521 A.2d 892 (App.Div. 1987). In such a situation R. 1:8-2(c) should govern. In effect, the latter issues in the case were determined by a jury of five. The verdict was one equivalent to that rendered by a six person jury after a member had been excused. Since when the jury was drawn neither party in this case stated on the record that he refused to stipulate that a jury of five by unanimous verdict could render a binding decision, the Rules provide that "the trial shall proceed and a verdict may be rendered by 5 of the jury agreeing." R. 1:8-2(c). And see Margolies v. Goldberg, 101 N.J.L. 75, 81-82, 127 A. 271 (E. & A. 1925) (where the parties *609 through their inaction permitted a civil jury to be reduced to 10 rather than the required 12, a valid verdict was returned). In fact, to inquire further into the reasons why a particular juror participated or did not participate might well improperly invade the sanctity of the jury's deliberations.
We therefore determine that where the dissenting juror's vote was unnecessary, as in this case, the lack of a Williams charge or an indication whether or not the dissenting juror participated in future deliberations does not disqualify the valid verdict rendered by the remaining five jurors.

B
The first trial judge gave a second reason for granting the motion for a new trial. He stated that under Draney v. Bachman, 138 N.J. Super. 503, 351 A.2d 409 (Law Div. 1976), he should have charged the jury that if it found plaintiff's conduct to have been willful, wanton or reckless, such conduct would have barred plaintiff's claim, and comparative negligence principles would not apply.
When we review this proposition from Draney v. Bachman, we see that it has since been eroded by subsequent developments in the law of comparative fault. We note that the Supreme Court extended "comparative negligence" set forth in N.J.S.A. 2A:15-5.1 et seq., to questions beyond the field of negligence, i.e., to "comparative fault." See Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 162-163, 406 A.2d 140 (1979). While the Draney v. Bachman rationale may still be viable in some circumstances, see Foldi v. Jeffries, supra, 93 N.J. at 548, 461 A.2d 1145, citing Draney, when percentages must be allocated in a multi-party case, it serves the interest of justice and our expanded concept of comparative fault for percentages also to be attributed to the conduct of the willful, wanton or reckless party, as well as the party who is *610 merely negligent.[6] As we have been taught by Suter v. San Angelo Foundry, supra, the labels attached by the law to various types of conduct should not thwart the principle that it is the overall fault of the parties which is to be measured. Such conduct is not ipso facto a bar to plaintiff's claim.
In the case before us, the 40% responsibility ascribed to the plaintiff's conduct by the jury, measured against the 60% assessed against Dr. Lester, indicates that the failure to charge willful, wanton or reckless conduct concerning plaintiff was at the most harmless error and should not have been considered a basis for a new trial.
We therefore reverse the order granting the new trial, reinstate the original verdict and remand the matter to the Law Division for the entry of the appropriate judgment.
NOTES
[1] McCann admitted using cocaine once, just before entering this program.
[2] The jury unanimously determined that Dr. Levy was free from negligence.
[3] We will later treat this second issue regarding the "willful, wanton or reckless conduct" charge.
[4] The Court in Williams referred to notions of judicial efficiency and economy. Id. at 634, 552 A.2d 153. Yet, finding in this case that the first verdict was infirm would militate against such principles.
[5] A related problem existed in Ragusa v. Lau, 233 N.J. Super. 84, 88-89, 558 A.2d 38 (App.Div. 1989), certif. granted 117 N.J. 63, 563 A.2d 828 (1989), where from the polling of the jury it was impossible to tell which juror had dissented, and in fact the jurors were asked merely to state whether each agreed that the vote had been five to one. No in-court opportunity was given for an additional dissenting juror then to express his or her views.
[6] The issue discussed in Draney v. Bachman would seldom reappear even if Draney remained good law. Willful, wanton and reckless conduct has been denominated as a separate tort. See Foldi v. Jeffries, 93 N.J. 533, 548, 461 A.2d 1145 (1983); Draney v. Bachman, supra. Yet when such conduct on the part of a plaintiff is measured against the simple negligence of a defendant, it should matter very little whether the conduct of the parties is assessed in a comparative fault formula, or whether a charge is given that the wanton conduct will bar a plaintiff's claim. Under the comparative fault formula, the percentage of fault attributable to the wanton or reckless plaintiff would generally exceed that attributable to the merely negligent defendant. Only if there were vastly different proximate cause elements would there be a different result.