284 N.J. Super. 585 (1995)
666 A.2d 163
ROBERT PETROLIA, PLAINTIFF-APPELLANT,
v.
ESTATE OF DR. HARVEY NOVA, DEFENDANT-RESPONDENT, AND ALFRED A. STEINBERGER, M.D., ENGLEWOOD HOSPITAL ASSOCIATION, AND "JOHN DOE," DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1995.
Decided October 17, 1995.
*587 Before Judges BAIME, VILLANUEVA and KIMMELMAN.
*588 James F. Carney argued the cause for appellant (Robert A. Vort, attorney; Mr. Carney, of counsel; Mr. Vort, on the brief).
George J. Kenny argued the cause for respondent (Connell, Foley & Geiser, attorneys; Mr. Kenny, of counsel; Thomas A. Sparno, on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
In this medical malpractice/informed consent case, a jury of five persons returned a unanimous verdict for defendant. Plaintiff appeals from the trial court's denial of his motions for: (1) a mistrial when the jury was reduced to five; (2) a directed verdict in his favor on the informed consent issue; (3) a judgment notwithstanding the verdict; and (4) a new trial. We reverse and remand for a new trial on all issues.
In 1969, plaintiff was completely paralyzed after a car accident. Eventually, plaintiff regained some ability of movement and was able to hold down a light job in his brother's towing business. In 1987, plaintiff began to experience some stiffness. Through a series of referrals, he met defendant Dr. Harvey Nova,[1] a neuro-surgeon, who determined that he could help plaintiff by means of a surgical procedure. Plaintiff agreed to undergo surgery and awoke from the procedure as a quadriplegic.
Plaintiff filed a complaint against defendants, Estate of Dr. Harvey Nova,[2] Alfred A. Steinberger, M.D., Englewood Hospital Association, and a fictitious unknown health care professional, John Doe. Prior to trial, Dr. Steinberger and the Englewood Hospital Association were dismissed as defendants. Plaintiff's complaint against Dr. Nova was based on two theories: (1) lack of *589 informed consent; and (2) negligence by Dr. Nova in performing the operation.
Eight jurors were impaneled for the trial, which was expected to last five to seven days. Due to inclement weather, however, the trial lasted approximately three weeks. For various reasons, three jurors had to be excused. At the time that the third juror was excused because of a heart attack, plaintiff moved for a mistrial, asserting his right to have six jurors. The trial judge, without stating her reasons, denied plaintiff's motion.
At trial, plaintiff contended that: (1) defendant did not inform him of the material risk of quadriplegia; and (2) if defendant had informed plaintiff of that risk, he never would have consented to the operation. The jury found otherwise, concluding that defendant had "reasonably disclosed to plaintiff the risk of quadriplegia involved in undergoing the operation" and defendant did not deviate from accepted standards of neurological practice. Although the jury rejected both of plaintiff's claims, the negligence claim is not directly at issue on appeal.
Plaintiff raises two arguments on appeal. First, the trial judge erred in allowing the trial to continue after the number of jurors was reduced to five. Second, the judge should have granted a directed verdict and/or a judgment notwithstanding the verdict in favor of plaintiff (or, in the alternative, a new trial) on the informed consent issue because there was no evidence from which the jury could reasonably have concluded that the defendant had informed plaintiff of the risk of quadriplegia, which was a material risk of the operation. We agree with plaintiff's first argument but disagree with the second.

I.
A litigant in a civil case enjoys a constitutional right of trial by jury. N.J. Const. art. I, ¶ 9. Our Constitution authorizes the trial of civil causes by a jury of six persons, and a litigant also enjoys the right to have the verdict "rendered by not less than five-sixths of the jury." Ibid. Rule 1:8-2(b) provides that juries *590 in civil actions "shall consist of six persons unless the court for good cause shown shall order a jury of 12 persons." The Legislature has provided that all six "jurors shall sit and hear the case, but the court for good cause may excuse any of them from service provided the number of jurors is not reduced to less than 12 or six in an appropriate civil cause." N.J.S.A. 2A:74-2.
Although the constitutional and statutory provisions guaranteeing a jury trial require a minimum jury of six persons in a civil case, the parties may stipulate to proceed with less than the minimum number or more than the minimum number, R. 1:8-2(d), and may even agree to have the case decided by a smaller majority of the jurors than five-sixths. See R. 1:8-2(c).
However, the right to a jury trial can be waived. R. 4:35-1; see also Sexton v. Newark Dist. Tel. Co., 84 N.J.L. 85, 101, 86 A. 451 (Sup.Ct. 1913), aff'd on other grounds, 86 N.J.L. 701, 91 A. 1070 (E. & A. 1914). Rule 1:8-2(c) is a specific example of waiver. It provides, in pertinent part:
If a jury of 6 is impaneled and sworn, the parties shall be deemed to have stipulated that in the event one juror is excused, the trial shall proceed and a verdict may be rendered by 5 of the jury agreeing, unless at the time the jury was drawn, any party by statement on the record refuses to so stipulate.
This rule was apparently adopted before alternates were generally used or routinely impaneled.[3] The rule is clearly inapplicable when alternates are impaneled and sworn because the rule refers to a situation where only six jurors are impaneled. Moreover, the very purpose of alternates is to insure that there are six jurors remaining at the end of a civil proceeding, even if during the course of the trial a juror, for any reason, is no longer able to serve. See State v. Brunson, 101 N.J. 132, 145-46, 501 A.2d 145 (1985); State v. Belton, 60 N.J. 103, 108, 286 A.2d 78 (1972) (both of which referred to the requirement of twelve jurors in a criminal case).
*591 The case of Waldman v. Cohen, 125 A.D.2d 116, 512 N.Y.S.2d 205 (Div. 1987), is very similar to this one. New York courts impanel six jurors as well as alternates in civil cases, N.Y.Civ.Prac.L. & R. § 4104, but, unlike New Jersey, have no rule similar to R. 1:8-2(c). In Waldman, a medical malpractice case, six jurors were impaneled together with two alternates. Both alternates were excused during the course of the trial and one impaneled juror had a heart attack on the morning of summations. Id. at 117, 512 N.Y.S.2d 205. The Appellate Division held that in the absence of consent by all parties, a jury made up of less than six persons cannot render a valid verdict. Id. at 119, 512 N.Y.S.2d 205. The court stated that, absent such consent, "unanimity of five jurors is not interchangeable with a five-sixths verdict of six jurors." Id.
The statutorily mandated minimum number of six jurors with a requirement of a least a five-sixths vote is based, in part, on the traditional freedom to disagree accorded to a minority juror. Id. at 119, 512 N.Y.S.2d 205. Justice Lazer enunciated the concern with the sanctity of the six-person jury, as follows:
The paramount importance of maintaining the independence and intellectual integrity of each juror is underscored by cases holding that all of the statutory number of jurors must participate in the decision-making process so that nonparticipation by a juror  whether due to illness or other cause  is destructive to a verdict, even where unanimity is not a requisite (see, e.g., Measeck v. Noble, 9 A.D.2d 19 [189 N.Y.S.2d 748]; Johnson v. Holzemer, 263 Minn 227 [116 N.W.2d 673]; City of Flat River v. Edgar, 412 S.W.2d 537 [Mo.]). These cases illustrate the principle that participation by less than all of its members deprives the jury of the reflections and judgment of an individual who might have opposed the verdict and might have persuaded one or more of the other jurors of the wisdom of his position (see Comment, Courts: Jurors Dissenting on Special Verdict Issue Excluded From Subsequent Deliberations, 61 Minn.L.Rev. 151, 161; 4 Weinstein-Korn-Miller, N.Y.Civ.Prac., ¶ 4113.03).
[Waldman, supra, 125 A.D.2d at 119, 512 N.Y.S.2d 205 (quoting Schabe v. Hampton Bays Union Free Sch. Dist., 103 A.D.2d 418, 427-28, 480 N.Y.S.2d 328 (1984)).]
Defendant argues that, regardless of whether R. 1:8-2(c) applies literally to this case, the underlying rationale of the rule, i.e. that a five-sixth's majority is needed to render a valid verdict, compels a determination that the rule applies to an impaneled jury of any *592 number that is governed by the five-sixths majority. Basically, defendant contends that the rule should be read broadly to require that a party who wants to preserve the right to six jurors object before any jury of more than six jurors is drawn, impaneled and sworn.
Presumably, the reason that a party must object to a deliberating jury of five "at the time that the jury [of six] was drawn," R. 1:8-2(c), is so that the judge, knowing that the party insists on six deliberating jurors, can impanel as many alternates as the judge believes are necessary to allow the trial to be completed. Obviously, a new juror cannot be impaneled after any opening statement is begun. R. 1:8-2(d).
Although the agreement of only five jurors is necessary to return a verdict, the presence of a sixth juror during deliberations may make a difference. "[N]umerous recent studies have demonstrated that the quality of the jury's discussion and deliberation is better in larger groups than in smaller ones." Richard S. Arnold, Trial by Jury: The Constitutional Right to a Jury of Twelve in Civil Trials, 22 Hofstra L.Rev. 1, 31 (1993). Arnold insists that the size of the deliberating jury may affect the stamina of jurors who take a position that is unpopular with the rest of the jury. Id. at 28-32. Furthermore, with only five deliberating jurors, the jury would have to reach a unanimous verdict, and it has been argued that the applicable voting scheme can affect the verdict. See Edward P. Schwartz & Warren F. Schwartz, Decisionmaking by Juries Under Unanimity and Supermajority Voting Rules, 80 Geo.L.J. 775, 786-87 (1992) (detailing the surprising ways that jury verdicts can be affected depending upon whether unanimity or supermajority is required).
To the extent that McCann v. Lester, 239 N.J. Super. 601, 608, 571 A.2d 1349 (App.Div. 1990), suggests that five jurors alone can deliberate and render a valid verdict, we disagree.

II.
Plaintiff's second argument is that there is no evidence from which the jury could reasonably have concluded that defendant *593 had properly disclosed the material risk of the operation to plaintiff, i.e., quadriplegia, and thus he was entitled to a finding that defendant was liable as a matter of law. Plaintiff contends that the only evidence directly on point is his own testimony that defendant did not warn plaintiff of the risk of quadriplegia, and that, had he known of that risk, he would never have consented to the operation.
We reject plaintiff's argument. It was plaintiff's burden to prove that defendant had breached his duty of disclosure, rather than defendant's burden to prove that he had satisfied the duty, and, until plaintiff proved the breach by a preponderance of the evidence, the jury was entitled to believe otherwise. Moreover, the jury was entitled to disbelieve plaintiff's recollection of the conversation with defendant and to find that a prudent patient in plaintiff's position would have undergone the operation even knowing that the risk of quadriplegia existed.[4]
The judge properly denied the motions for a directed verdict, a judgment notwithstanding the verdict and a new trial. Plaintiff had the burden of proof not only as to the applicable standard of disclosure, but also with respect to the fact that defendant deviated from that standard. Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc., 53 N.J. 157, 161, 249 A.2d 382 (1969); Long v. Landy, 35 N.J. 44, 54, 171 A.2d 1 (1961). Plaintiff also had the burden of proving that quadriplegia was a material risk. Largey v. Rothman, 110 N.J. 204, 211-12, 540 A.2d 504 (1988) (quoting Canterbury v. Spence, 464 F.2d 772, 787 (D.C. Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)). Assuming, arguendo, that plaintiff had proved the materiality of the risk of quadriplegia, plaintiff also had the burden of proving that Dr. Nova did not disclose the risk.
*594 At trial, defendant offered as evidence a signed form dated April 25, 1988, entitled "Special Consent for Operation or Other Procedure," that contained a signature above the line designated "[s]ignature of patient or other person responsible." Paragraph one of that form authorized Dr. Nova to perform a cervical laminectomy on "myself" while paragraph two indicated that the doctor had discussed "with me" the "items that are briefly summarized below." The items set forth in the consent form were:
(1) The nature and purpose of proposed procedure(s);
(2) The risks of the proposed procedure(s), including the risk that such treatment may not improve my condition;
(3) The possible or likely consequences of the proposed procedure;
(4) Alternative ways of treatment;
(5) The prognosis if no treatment is received.
The patient's portion of the consent form concluded with the patient's certification that:
I have read and fully understand the above consent for operation or other procedure; and that the doctor has explained all of the information in [paragraphs] 1-3 and has answered my questions to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed treatment.
The consent form contained a signature above the patient signature line. Although plaintiff's signature was witnessed by a registered nurse, who so testified, plaintiff denied signing the form.
The consent form concluded with a physician's certification signed by Dr. Nova that he "personally explained the nature of the patient's condition, the need for treatment, the operation to be performed, and the risks, possible consequences and alternatives" to the patient.
Because the defendant was dead and could not rebut any of plaintiff's evidence, it was reasonable for a jury to assume that before operating on a patient already having previously been completely paralyzed, the neurosurgeon, defendant herein, informed the plaintiff of the risk of quadriplegia. In fact, a note in plaintiff's hospital chart prepared by Dr. Nova indicated that the doctor "[e]xplained [the] operation to patient and the fact that he *595 has cord atrophy, and that he may not improve with surgery and may get worse with [the] operation. Also risks of surgery, that is infection, bleeding, and anesthesia explained. He understands and agrees." Given that plaintiff just prior to the operation "had progressive paralysis leading to quadriparesis of his arms and legs," a jury could well find it difficult to envision how his condition could "get worse" and yet be anything other than quadriplegia.
Whether a prudent patient in plaintiff's position would have foregone the procedure if advised of the risk of quadriplegia was vigorously disputed at trial. Plaintiff testified that, had he known of the risk of quadriplegia, he never would have undergone the operation. However, defendant's medical experts testified that plaintiff's neurological capabilities were deteriorating toward quadriplegia anyway, and the operation was plaintiff's best opportunity to prevent quadriplegia. Therefore, there was a jury question as to the materiality of the risk.
Plaintiff also contends that the failure of defendant to refer specifically to quadriplegia as one of the risks of surgery in the informed consent form signed by plaintiff is, as a matter of law, a deviation of accepted medical standards, particularly in light of the fact that plaintiff had previously been paralyzed. However, it is unnecessary to reach this issue since the totality of the circumstances, i.e., the signed consent form, the doctor's note, and the patient's worsening condition, support the jury verdict that the plaintiff gave informed consent to the operation.
The judgment under review is reversed. We remand to the trial court for a new trial consistent with this opinion.
NOTES
[1] Dr. Nova died before the complaint was filed. Defendant refers to "Dr. Harvey Nova."
[2] We note that the proper defendant should be the duly appointed representative of Dr. Nova's estate.
[3] The Historical Note to N.J.S.A. 2A:74-2 states that the statute was first adopted in 1948.
[4] We recently discussed the prudent patient standard for determining causation in informed consent cases in Conklin v. Hannoch Weisman, P.C., 281 N.J. Super. 448, 455-56, 658 A.2d 322 (App.Div. 1995), which is now applicable.