692 A.2d 68

WALDER, SONDAK, BERKELEY & BROGAN, PLAINTIFF/RE-
SPONDENT, v. JOSEPH LIPARI, DEFENDANT, AND FORIST
DISTRIBUTORS, INC., AND TOP GRADE SAUSAGE, INC., DE-
FENDANTS/APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued February 3, 1997—Decided April 22, 1997.

Before Judges PETRELLA, LANDAU, and WALLACE.

*Patrick T. Collins* argued the cause for appellant (*Franzblau Dratch,* attorneys; *Mr. Collins,* on the brief).

*Barry A. Kozyra* argued the cause for respondent (*Walder, Sondak & Brogan,* formerly *Walder, Sondak, Berkeley & Brogan,* respondent pro se; *Mr. Kozyra,* of counsel and on the brief).

WALLACE, JR., J.A.D.

Plaintiff Walder, Sondak, Berkeley & Brogan, a law firm, sued Joseph Lipari, its former client, and two corporations, defendants Top Grade Sausage, Inc. (Top Grade) and Forist Distributors, Inc. (Forist) for legal fees in connection with a federal criminal indictment and trial. The jury returned a verdict in favor of plaintiff in the amount of $500,000. Defendants' motion for judgment notwithstanding the verdict or for a new trial was denied. On appeal,

defendants [1] contend in varying arguments that the alleged oral agreement that they would guarantee the legal fees was not valid and that the vote by six-to-two on two of the jury findings was invalid under the New Jersey Constitution. We affirm.

## I

The salient proofs introduced at trial are as follows. Lipari, the former Mayor of Passaic, is the founder of Top Grade and Forist. In 1991, he became the subject of a federal investigation. He hired plaintiff to represent him in that investigation. On July 25, 1991 Lipari executed a written retainer agreement with plaintiff and paid a retainer fee of $35,000.

The investigation encompassed various activities of Lipari, his children and defendants. Plaintiff handled pre-indictment legal issues, and responded to grand jury subpoenas for various documents and testimony regarding defendants and Lipari's children.

By 1992 Lipari had gifted most of his shares in defendants to his children. Nevertheless, Lipari continued to retain dominant management and operational control over both corporations. He received a weekly salary of $5,000 from each corporation. Two of Lipari's children worked for defendants. Marilyn Manganello, Lipari's daughter, was vice president and secretary of defendants. She started working for them in 1985 when she was seventeen and became vice president that year or the following year. She did the bookkeeping and handled the accounts payable and receivable. Marilyn's responsibilities increased as Lipari became more involved with his mayoral duties. In 1990 and 1991 she dealt with customers, negotiated prices, inspected incoming meat for acceptability, and dealt with health inspectors.

James Lipari, Lipari's son, was president of both corporations. He started working for them in 1980, at the age of seventeen and just out of high school. By 1990 he ran the manufacturing plant

---

[1] Defendant Joseph Lipari did not appeal the judgment against him.

and hired and supervised employees. In 1991 he owned sixty percent of the shares of both corporations, Marilyn owned thirty percent, and Lipari owned ten percent. James's and Marilyn's shares had been "gifted" to them by Lipari.

Marilyn received a salary of $2,000 per week and James a salary of $3,000 per week. Defendants acknowledged in their interrogatory answers that Lipari, on behalf of defendants, "signed numerous documents, including letters, checks and forms," and "in some instances" may have "acted on behalf of the corporation[s]" when entering into "contractual agreements" with third parties. Marilyn could not recall an objection by her or James to any action or decision Lipari made concerning defendants' business before his conviction.

Lipari was the primary contact for one of Top Grade's larger accounts. In addition, in the year preceding his indictment, Lipari negotiated a commission arrangement with one of defendants' meat suppliers. At the time of his federal trial Lipari was solely responsible for Forist's only account, but he was not principally responsible for generating the majority of Top Grade's accounts.

Justin Walder was a partner in plaintiff. According to Walder, in their first meeting in 1991, Lipari told him about a federal investigation that related to his position as mayor and had "some relationship" to defendants. Lipari was concerned about protecting defendants because two of his children were working very hard for them. Defendants were identified with him personally, and adverse publicity about defendants might scare away the large public companies that were a major part of defendants' business. A written retainer letter was executed, and $35,000 was paid.

In March 1992, Lipari was indicted by a federal grand jury. He entered into a second retainer agreement with plaintiff dated March 17, 1992. The terms were substantially identical to those in the first retainer letter, except that the retainer was $175,000. Lipari signed the retainer agreement and paid the $175,000.

Marilyn, James, and defendants were not indicted. Plaintiff responded in answers to interrogatories that in 1992 Lipari indicated to Walder "that he and [defendants] would make payment for all legal services rendered to [him]" by plaintiff, and that the services rendered to him were for defendants' benefit as well.

Marilyn acknowledged speaking with Walder before each of her two grand jury appearances, during which she testified concerning her work for defendants. She also acknowledged in her deposition testimony that she had said she understood that Walder was representing defendants and her as well as Lipari.

In November 1992 the federal prosecution of Lipari ended in conviction. The sentence included a prison term and a $186,000 fine.

Plaintiff never sent bills to either defendant at its business address. However, from July 1991 through November 1992, plaintiff received twenty-five checks from Top Grade totalling $421,271.01 and six checks from Forist totaling $73,927.48. During that period plaintiff also received two checks from Lipari totalling $20,000 and one cashier's check for $30,000. Plaintiff admitted that no written agreement existed between it and either corporation "other than the checks submitted by defendants," which were "consistent with ... Lipari's promises and agreements" for defendants to pay his bills.

Other correspondence between plaintiff and defendants, plus correspondence between plaintiff, defendants' accountants, banks, and suppliers confirmed that plaintiff performed at least some services for defendants in connection with the federal grand jury proceedings, including defendants' production of subpoenaed documents. Walder testified that "Lipari clearly asked me and authorized that I handle" that matter. He added that he was authorized to accept service of all the federal subpoenas for Lipari's children, and he helped them prepare to testify about defendants' business and their roles in it. No other attorney represented defendants or Lipari's children in the federal matter.

James testified that defendants decided to lend Lipari money for legal bills and the fine when Lipari "ran out of money." James certified that defendants' payments of some of Lipari's legal expenses reflected only loans to Lipari rather than defendants' agreement to be directly responsible for them. He said that Lipari as a ten-percent shareholder had no authority to make such a commitment. Further, he said that neither Lipari nor plaintiff asked either of the corporations to guarantee payment of Lipari's legal expenses. However, James added:

As a practical matter, in light of his continued incarceration, failing health and the unlikelihood of his having the ability to earn substantially [sic] in the future due to the impact of the negative publicity surrounding this affair and his criminal conviction, I was doubtful that my father would ever have the ability to repay these monies.

James also averred that during the pendency of the federal case Lipari's "personal savings were exhausted" and he had "nowhere else to turn" but to defendants.

There is no documentation of the alleged loans between defendants and Lipari other than notations to that effect in defendants' check registers. Marilyn was shown some documents, one of which she identified as an October 31, 1991 asset statement for Forist, with a loan receivable in the amount of $2,477.35. Forist's October 1992 asset statement had the same $2,477.35 loan receivable, plus a $5,000 loan receivable for stockholders. Top Grade's September 30, 1991, asset statement showed a loan receivable from Lipari with a balance of zero, and its September 1992 asset statement showed a loan receivable of $10,525. Further, Forist's October 1993 asset statement showed a $30,000 loan receivable from Lipari, and Top Grade's September 1993 asset statement showed a $70,525 loan receivable from Lipari.

According to Walder, Lipari told him on various occasions that while he might have a temporary difficulty in paying his bills, he had never "stuck anybody" in his life, his children were aware of the bills, and defendants would pay the bills. At least once Lipari said that defendants would have funds to pay the bills after "running a warehouse sale." Nicholas Dottoli, a private investiga-

tor hired by plaintiff to help with defending Lipari in the federal action, testified that Lipari had told him the same.

Walder treated the fact that defendants were paying Lipari's bills as confirmation of Lipari's control over defendants. Walder testified that "[n]othing was ever put in writing" because:

I accepted what he told me, it was his company. It was clear to me he controlled his kids, he controlled that company in every way, because he was a very strong father and a good father, I suspect, but I took him at his word. . . .

. . . .

. . . I knew he controlled the companies by his actions. I did not know the precise share holding. It was my belief that Joseph Lipari gave some shares to his children. It would not surprise me, and I don't recall specifically that he tried to divest himself of . . . shares with his children over a period of years, for whatever reasons, but there is no[ ] doubt in my mind that he controlled those companies and his children did what Joseph Lipari requested that they do. . . .

Walder also believed that Lipari's control was demonstrated by Lipari's annual salary of half a million dollars from defendants and his responsibility for their largest customer.

On May 4, 1993, plaintiff sent a letter addressed to Lipari and defendants at defendants' business address, and also addressed to Lipari at his home address claiming $502,455 in unpaid legal fees. The letter stated that "legal fees have been paid to this firm by each of you" and described the right to seek fee arbitration before plaintiff would file a lawsuit to collect its fees. Defendants acknowledged receipt of a demand for payment by plaintiff but that they did not respond.

Raymond Brown testified for plaintiff as an expert in trial practice. He said that it is a normal practice that a closely-held corporation pays the legal bills "rendered to their principals" because most individuals defending against a complex federal case must "resort to a family-held corporation or to other family agencies in order to pay" their legal bills. In his experience the arrangement was usually not reflected in a writing, in part to avoid publicly linking the family business to the case. His own retainer agreements usually did not specify who would pay because it was understood that "the ordinary defendant has to rely on his family, his small business, and whatever to pay me."

Based on this evidence, the eight-member jury unanimously answered "yes" to the question whether plaintiff proved by a preponderance of the credible evidence that defendant Lipari promised that the two corporations would pay for the legal fees involved in representation of the criminal case. The jury unanimously valued plaintiff's services at $500,000. However, the jury split six to two in finding that plaintiff proved by clear and convincing evidence that the promise "had as its leading object or main purpose to benefit [defendants]," and that the promise "was of little or no benefit to Joseph Lipari."

## II

■ Defendants contend that the oral guaranty is unenforceable under the Statute of Frauds. They argue that a January 5, 1996 amendment to the Statute of Frauds, which did not incorporate the case-law exception for oral guarantees invalidates that exception and that under the time-of-decision rule the new statute controls. Further, defendants urge that more recent decisions hold that the exception for oral guarantees is not available for guarantees of obligations for legal fees. We reject these arguments.

The Statute of Frauds in effect at the time of trial provided in part:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:
>
> . . . .
>
> b. A special promise to answer for the debt, default or miscarriage of another person[.]
>
> [*N.J.S.A.* 25:1-5 (amended by *L.* 1995, c. 360, § 8, effective January 5, 1996).]

In *Schoor Assoc. v. Holmdel Heights Constr. Co.*, 68 *N.J.* 95, 101–02, 343 *A.*2d 401 (1975), our Court set forth the "leading object" or "main purpose" exception to the statute:

> "When the leading object of the promise or agreement is to become guarantor or surety to the promisee for a debt for which a third party is and continues to be

primarily liable, the agreement, whether made before or after or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute."

[*Id.* at 102, 343 *A.*2d 401 (quoting 2 *Corbin on Contracts* § 366, at 273–74 (1950)).]

Contrary to defendants' representations, neither *In re Travarelli*, 283 *N.J.Super.* 431, 662 *A.*2d 572 (App.Div.1995), nor *DeGraaff v. Fusco*, 282 *N.J.Super.* 315, 660 *A.*2d 9 (App.Div.1995), called for special treatment of guarantees to pay legal fees, as neither case involved a guarantee to pay the legal fees that another person incurred under a valid retainer agreement. Instead, they both turned on the absence of a retainer agreement. *Travarelli, supra,* 283 *N.J.Super.* at 436–38, 662 *A.*2d 572; *DeGraaff, supra,* 282 *N.J.Super.* at 320, 660 *A.*2d 9. Moreover, neither case even mentioned the *Schoor* case or the "leading object" exception to the Statute of Frauds.

As of January 5, 1996, the Legislature deleted paragraph b from *N.J.S.A.* 25:1–5, thereby removing guarantees from the list of "agreements or promises" on which actions were barred in the absence of a writing. *L.* 1995, *c.* 360, § 8. However, as of the same date it enacted a new coordinate statute requiring guarantees to be in writing: "A promise to be liable for the obligation of another person, in order to be enforceable, shall be in a writing signed by the person assuming the liability or by that person's agent." *L.* 1995, *c.* 360, § 6 (codified as *N.J.S.A.* 25:1–15).

■ While the Legislature's repeal of particular statutory language ordinarily invalidates a case law doctrine based on an interpretation of that language, *see IFA Ins. Co. v. Waitt,* 270 *N.J.Super.* 621, 624–27, 637 *A.*2d 941 (App.Div.) (significant change to statute demonstrated Legislature's rejection of a doctrine that courts established by interpreting the prior statutory language), *certif. denied,* 136 *N.J.* 295, 642 *A.*2d 1004 (1994), in this case the Legislature replaced the provision in question with a similar one.

■ "It is a principle of statutory construction that when the Legislature re-enacts a statute which has been judicially construed, it adopts that judicial interpretation." *Smith v. U.S. Pipe & Foundry Co.*, 191 *N.J.Super.* 454, 463, 467 *A.2d* 584 (App.Div. 1983), *aff'd sub nom. Poswiatowski v. Standard Chlorine Chemical*, 96 *N.J.* 321, 475 *A.2d* 1257 (1984). That same principle applies when the Legislature re-enacts a substantive statutory provision with changes that make no functional difference. *See Quaremba v. Allan*, 67 *N.J.* 1, 14, 334 *A.2d* 321 (1975) (when Legislature modifies statute without changing the language construed in prior judicial decisions, Legislature is presumed to accept continuing validity of those decisions); *State v. Burns*, 159 *N.J.Super.* 539, 545, 388 *A.2d* 987 (App.Div.1978) (where Legislature made no substantive change in statute following judicial interpretation of it, presumption of legislative familiarity with judicial decisions meant that lack of substantive change in the construed language signalled continuing acceptance of the judicial interpretation); *see also Calabro v. Campbell Soup Co.*, 244 *N.J.Super.* 149, 164, 581 *A.2d* 1318 (App.Div.1990) ("The intention to change a long-established rule or principle is not imputed to the Legislature absent a clear manifestation."), *aff'd o.b.*, 126 *N.J.* 278, 597 *A.2d* 83 (1991).

The legislative history merely describes the contents of the new provisions and notes the changes they represent. It contains no statement indicating that the Legislature had in mind any greater purpose, and it makes no reference to *Schoor* or the leading object doctrine. *See Senate Jud. Comm. Statement to A. 1550* (February 6, 1995); *Assembly Jud., Law and Pub. Safety Comm. Statement to A. 1550* (November 21, 1994); *Sponsor's Statement to A. 1550* (March 15, 1994).

Consequently, in the absence of a meaningful difference between the former and current statutes, we reject defendants' contention that the Legislature intended to invalidate *Schoor.* Although the Legislature repealed the particular language that

*Schoor* interpreted, it simultaneously enacted substantially similar language that is susceptible to the same interpretation.

The "time-of-decision" rule is the "well-established principle that an appellate court on direct review will apply the statute in effect at the time of its decision, at least when the legislature intended that its modification be retroactive to pending cases." *Kruvant v. Mayor and Council of Cedar Grove*, 82 *N.J.* 435, 440, 414 *A.*2d 9 (1980). It is inapplicable here, because the absence of a substantive difference between *N.J.S.A.* 25:1–15 and the former *N.J.S.A.* 25:1–5(b) means there is no "changed" or "new" provision, and hence no question about whether the Legislature intended to apply such a provision retroactively. *Cf. Kruvant, supra*, 82 *N.J.* 435, 414 *A.*2d 9 (general discussion of time-of-decision rule); *Lake Shore Estates v. Denville Township Planning Bd.*, 255 *N.J.Super.* 580, 605 *A.*2d 1106 (App.Div.1991) (same), *aff'd o.b.*, 127 *N.J.* 394, 605 *A.*2d 1073 (1992).

■ Defendants also contend that plaintiff's proofs failed to meet the requirements of the *Schoor* test. Defendants appear to argue that the trial judge should have granted their motion for judgment notwithstanding the verdict because the main purpose of their guarantee to pay Lipari's bills was for Lipari rather than the corporations.

■ In order to satisfy the *Schoor* exception to the Statute of Frauds, one must show that the "leading object of the promisor is to subserve some interest or purpose of his own." *Schoor, supra*, 68 *N.J.* at 102, 343 *A.*2d 401. Here, Marilyn's and James's testimony about the continued association of Lipari with defendants' business in the minds of some of their customers gave defendants a reason to help Lipari fight potential convictions that would harm their reputation and induce some customers to stop doing business with them.

In answer to interrogatories on the verdict sheet, the jury found that the "leading object or main purpose" of the promise to pay Lipari's legal bills was to benefit defendants and "was of little or

no benefit to" Lipari. We must defer to the jury's judgment, and not substitute our own unless it "clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1; *see Dolson v. Anastasia,* 55 *N.J.* 2, 6–7, 258 *A.*2d 706 (1969). We find no miscarriage of justice to warrant our interference. The trial judge properly denied defendants' motion for judgment notwithstanding the verdict or in the alternative for a new trial.

## III

■ Defendants also claim that their failure to adopt a corporate resolution renders the guarantee ineffective. Further, defendants urge that the guarantee was void for lack of consideration because neither they nor Lipari received a new benefit for the guarantee.

■ We disagree with these contentions. Initially, we note that defendants failed to raise these contentions below and we need not address them on appeal. *See Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973). Even if we do address them, it is clear that the corporation laws require a resolution for a guarantee only if the guarantee has no apparent business purpose: "A corporation may give a guaranty *not in furtherance of its direct or indirect business interests* only when authorized at a meeting of shareholders by the affirmative vote of all of the votes cast by the holders of each class and series of shares entitled to vote thereon." *N.J.S.A.* 14A:3–3(1) (emphasis added). While the guaranty must be supported by consideration, the benefit to the guarantor's business need only be slight, even when the guarantee is a "mere promise to pay an antecedent debt of another." *Great Falls Bank v. Pardo,* 263 *N.J.Super.* 388, 400–01, 622 *A.*2d 1353 (Ch.Div.1993), *aff'd,* 273 *N.J.Super.* 542, 642 *A.*2d 1037 (App.Div.1994); *see also Ross v. Realty Abstract,* 50 *N.J.Super.* 147, 153–54, 141 *A.*2d 319 (App.Div.1958).

Here, defendants' guaranty was accompanied by plaintiff's agreement to provide legal service. The jury's finding that defendants' leading object in issuing the guarantees was their own

business interest resolves both of defendants' claims. That finding led to a conclusion that defendants had had a self-protection interest in guaranteeing the payment of Lipari's legal bills, because of their good will associated with Lipari. That interest was the consideration. In addition, defendants do not contest that plaintiff represented defendants in producing documents or preparing their officers, James and Marilyn, for grand jury testimony.

## IV

We turn now to defendants argument that the verdicts on two jury questions, rendered by votes of six jurors to two were invalid. Defendants contend that the New Jersey Constitution requires a verdict to be rendered by five-sixths of the jury, and that the constitutional infirmity of a verdict rendered by only three-fourths of the jury is cognizable as plain error. Plaintiff claims that defendants agreed to accept a jury vote of six to two in "an unrecorded general discussion" in which the court recommended that the parties let the two alternate jurors deliberate and accept verdicts reached by a vote of at least six jurors. Defendants dispute this and insist that what transpired was in fact no more than a failure to object on the part of defendants' counsel.

Our Constitution provides that "[t]he right of trial by jury shall remain inviolate; but the Legislature shall authorize the trial of civil causes by a jury of six persons. The Legislature may provide that in any civil cause a verdict may be rendered by not less than five-sixths of the jury." *N.J. Const.* art. I, ¶ 9.

A civil jury "shall consist of six persons unless the court for good cause shown shall order a jury of 12 persons," *R.* 1:8–2(b), but it may also consist of "such other number as may be stipulated to." *R.* 1:8–2(d). Such a jury may render its verdict "by five-sixths of the jurors unless the parties stipulate that a verdict or finding by a smaller majority of the jurors shall be taken as the verdict or finding of the jury." *R.* 1:8–2(c). The Legislature has similarly provided that "at least five-sixths of the jurors shall

render the verdict unless the parties stipulate that a smaller majority of jurors may render the verdict." *N.J.S.A.* 2B:23-17 (effective June 5, 1995). The statutes do not prohibit a civil jury of more than six members; they allow the court to empanel more than six, and compel the dismissal of jurors only when more than the "prescribed" number are still sitting at the end of the court's charge. *N.J.S.A.* 2B:23-3 (effective June 5, 1995).

Recently, we explained that our constitution and rules do not mandate in all instances a verdict by five-sixths vote, but allow the parties to accept a verdict rendered by a lesser percentage; *Petrolia v. Estate of Nova,* 284 *N.J.Super.* 585, 589-90, 666 *A.2d* 163 (App.Div.1995), *certif. denied,* 143 *N.J.* 516, 673 *A.2d* 276 (1996). We noted that:

> Although the constitutional and statutory provisions guaranteeing a jury trial require a minimum jury of six persons in a civil case, the parties may stipulate to proceed with less than the minimum number or more than the minimum number, *R.* 1:8-2(d), and may even agree to have the case decided by a smaller majority of the jurors than five-sixths.
>
> [*Id.* at 590, 666 *A.2d* 163.]

In the charge to the jury, the trial judge reviewed the questions that were asked of the jury. He instructed that on each question there must be six votes. The judge explained:

> I want to know folks on that whether your vote is six to two, seven to one, or eight to zero. For it to be a valid vote I need at least six of you, but it can be any six. So for question one you could have the first six, for question two you could have the middle six of you, for question three you could have the last six of you. So I don't care where I get the six, but I need at least six of you for each vote. . . .

At the conclusion of the charge, the judge asked counsel if they had any objections. Both plaintiff's counsel and defendants' counsel responded that they had none, inferentially agreeing with the above statement. Furthermore, the transcript of the hearing on defendants' motion to dismiss and motion for judgment notwithstanding the verdict or for a new trial reveals that defendant failed to raise as a point of error the jury vote. We deem this to be confirmatory of the parties' intentions at the time of trial and jury deliberation.

. Unlike the typical instance of "plain error" exception to *Rule* 2:10–2, defendants' acquiescence or inaction itself obviously led the court to believe that its openly-communicated recommendation as to the eight-person jury vote and its jury charge on that subject was agreeable. If the defendants had an objection to the procedure used, that objection should have been made known to the judge prior to jury deliberations. The judge could readily have reduced the jury to six persons, or altered the vote instruction. Under these circumstances, we do not agree with defendants' belated objection. To do so would condone a tactic of inducing error, awaiting the outcome, and then raising the issue on appeal when the outcome is unfavorable. We find no plain error to justify reversal.

In so ruling, we recommend that an agreement to have a case decided by less than five-sixths of a jury panel be specifically articulated upon the record.

Affirmed.