773 A.2d 1102

MICHAEL MAHONEY, EXECUTOR AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF ELAINE BROWN, DECEASED, AND MICHAEL MAHONEY, INDIVIDUALLY, PLAINTIFF–APPELLANT, v. DR. MARVIN S. PODOLNICK AND DR. DAVID LANDSET, J/S/A., DEFENDANTS–RESPONDENTS.

Argued September 11, 2000—Decided January 31, 2001.

*Donald G. Targan* argued the cause for appellant (*Donald G. Targan & Associates,* attorneys; *Mr. Targan* and *Michael J. Pender,* on the briefs).

*James P. Savio* argued the cause for respondent Dr. Marvin S. Podolnick (*Mr. Savio,* attorney; *Mr. Savio* and *Sophia M. Canosa,* on the brief).

*Paul F. Schaaff, Jr.* argued the cause for respondent Dr. David Landset (*Orlovsky, Moody & Schaaff,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns a medical malpractice cause of action in which the trial court vacated the verdict of a seven-member jury and ordered a second trial. We granted certification primarily to consider whether a jury verdict must be invalidated when one juror allegedly fails to answer two of twelve interrogatories on the verdict sheet.

In 1992, petitioner Michael Mahoney, Administrator ad Prosequendum of the estate of his mother Elaine Brown, filed a medical negligence action against respondents Marvin Podolnick, M.D., a radiologist, and David Landset, D.O., a gastroenterologist. The complaint alleged that respondents failed to treat and diagnose Brown's stomach cancer between July 1990 and April 1991, depriving her of the chance for a cure or longer survival. The first trial commenced in April 1997 and lasted for ten days. The jury deliberated for two days and found Podolnick and Landset negligent and that their negligence was a proximate cause of Brown's "loss of chance" of a cure or longer life. The jury awarded Brown damages of $700,000, that was subsequently reduced to $455,000 based on the following apportionment of causative factors: Podolnick 15%; Landset 50%; Brown's pre-existing stomach cancer 35%. The net jury award also included $50,000 for pain and suffering.

Within ten days of the verdict, respondents moved for a judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court granted the new trial motion. Brown moved for leave to appeal but the Appellate Division denied the motion. The second jury also found respondents negligent and that their negligence was the proximate cause of Brown's pain and suffering. However, the jury reduced petitioner's damages to $100,000 because it did not find respondents responsible for Brown's "loss of chance" of a longer survival or cure.

Following the second trial, petitioner appealed and sought to reinstate the first jury verdict. The Appellate Division entered an order remanding the matter to the trial court for a more detailed

statement of the reasons why the court vacated the first jury verdict. The Appellate Division explained that a fuller statement was necessary because at the first trial the court reporter failed to record the side-bar conferences. After reviewing the trial court's response, the Appellate Division in an unpublished opinion upheld the judgment vacating the initial verdict. That court stated that the most significant reason for granting a new trial was the failure of one juror "to deliberate on all issues." We now reverse the judgment of the Appellate Division and reinstate the first jury verdict in favor of petitioner.

I

Podolnick began caring for Brown on July 17, 1990. At that time, Brown reported that she was experiencing pain in her stomach and that her medication was not working. She told Podolnick that the pain was on her left side and in the upper part of her stomach. During that visit, Podolnick performed a series of upper gastrointestinal x-rays of the esophagus, stomach, and small intestine (upper GI series). According to Brown, Podolnick told her that everything was fine, but recommended an endoscopy at her convenience.

At trial, petitioner's expert, Dr. David Befeler, explained that the July 17, 1990 x-rays showed a potential cancerous growth. According to Befeler, the x-rays showed a "persistent defect" of enlarged folds at the greater curvature of Brown's stomach. Befeler concluded that the x-rays revealed a serious condition, and that Podolnick deviated from the standard of care because he failed to recommend immediate endoscopy, surgery, or both.

On September 4, 1990, Brown, still complaining of pain, went to see Dr. David Landset. Landset performed an endoscopy to determine the cause of Brown's abdominal pain and melena (blood in the stool). Landset testified that he never reviewed Podolnick's upper GI report or the stomach x-rays that Podolnick took on July 17, 1990. According to Befeler, Landset's failure to review Podolnick's x-rays and report was a deviation from the standard of care.

Befeler also concluded that Landset acted improperly because he failed to examine endoscopically the greater curvature in Brown's stomach, take biopsies from that area, and recommend immediate surgical consultation.

On December 28, 1990, Podolnick performed a second upper GI series on Brown because she was still complaining of severe stomach pain. At trial, Podolnick was asked to compare that x-ray to the x-rays from the first GI series that he administered five months earlier. Podolnick maintained that he did not see any progressive change in Brown's condition. However, Befeler testified that Podolnick was wrong because there was clearly a progressive enlargement of the stomach area.

On January 28, 1991, Brown was still complaining of severe abdominal pain and, in an effort to determine the cause of her pain, Landset performed a second endoscopy and took biopsies from the greater curvature. Landset saw irregularities but neither concluded nor informed Brown that she might have stomach cancer. In view of the noticeable irregularities, and that cancer had not been ruled out, Befeler asserted that Landset should have recommended immediate surgery. Two months later, Landset performed a third and final endoscopy on Brown. Following that procedure, Landset diagnosed Brown with an inflammatory stomach condition. Landset never diagnosed Brown as having stomach cancer, nor did he ever inform Brown of the possibility of cancer.

After two upper GI series, three endoscopies and nine months of severe pain, Brown was still seeking relief. On April 5, 1991, she went to Philadelphia, Pennsylvania to meet with Dr. Dominick DeLaurentis. DeLaurentis examined Brown and reviewed the July and December 1990 x-rays. At trial he testified that he recognized the abnormalities as cancer. Five days after seeing Brown, DeLaurentis operated and removed Brown's stomach, omentum and spleen. DeLaurentis testified that soon after surgery Brown's condition improved dramatically, and that she was able to enjoy three relatively comfortable remaining years. Brown died on March 21, 1994 at age fifty-six.

Defendants' expert oncologist, Dr. Paul Engstrom, agreed that both the July and December 1990 x-rays showed an abnormality in Brown's stomach. Engstrom also agreed that the best evidence of whether Brown's cancer had spread before July 1990 would have been revealed if surgery had been performed in July 1990 and the surrounding lymph nodes examined. Engstrom acknowledged further that between July 1990 and April 1991 the cancerous tumor grew and the disease spread. However, Engstrom testified that even though defendants had not diagnosed Brown's cancer, by July 1990, Brown's cancer had already penetrated the wall of her stomach, likely spread to her lymph nodes, and was incurable.

The case was tried to a seven member jury.[1] At the end of the trial, the jurors were provided with a verdict sheet that read as follows:

1. Did defendant Dr. Podolnick deviate from the accepted standards of medical practice?
   Yes _____    No _____    Vote _____

   If yes, go on to the next question; if no, skip to question 4.

2. Did defendant Dr. Podolnick's deviation increase the risk of harm posed by Elaine Brown's stomach cancer?
   Yes _____    No _____    Vote _____

   If yes, go on to the next questions; if no skip to question 4.

3. Was the increased risk a substantial factor in reducing Elaine Brown's life expectancy?
   Yes _____    No _____    Vote _____

   Go on to next question.

4. Did defendant Dr. Landset deviate from accepted standards of medical practice?
   Yes _____    No _____    Vote _____

---

[1] At the start of the trial, there were eight jurors. However, on April 30, juror number four was excused. According to the trial transcript, the juror told the court prior to the commencement of trial that she would have to leave if the case lasted beyond April 30.

If yes, go on to next question; if no, and if you have answered no to 1, 2 or 3 you may cease your deliberations.

5. Did defendant Dr. Landset['s] deviation increase the risk of harm posed by Elaine Brown's stomach cancer?
Yes _____    No _____    Vote _____

If yes, go on to next question; if no, and if you have answered no to 1, 2 or 3 you may cease your deliberations.

6. Was the increased risk a substantial factor in reducing Elaine Brown's life expectancy?
Yes _____    No _____    Vote _____

If yes, go on to next question; if no, and if you have answered no to 1, 2 or 3 you may cease your deliberations.

7. State in percentages that portion of the reduction of Elaine Brown's life expectancy which resulted from:

   A.  Her pre-existing stomach cancer                    _____

   B.  Dr. Podolnick's negligence                         _____
       (The loss of chance)

   C.  Dr. Landset's negligence                           _____
       (The loss of chance)

                                               Vote _____

Go on to the next question.
8. Set forth the amount of money, expressed in a lump sum, which would reasonably compensate the Estate of Elaine Brown for her reduced life expectancy.
                                               Vote _____

Go on to the next question.
THE FOLLOWING SECTION PERTAINS TO THE CLAIM FOR PAIN AND SUFFERING FOR THE PERIOD BE-TWEEN JULY 17, 1990, AND APRIL 5, 1991. ANSWER THE FOLLOWING QUESTIONS ONLY IF YOU HAVE ANSWERED YES TO QUESTION 1 OR QUESTION 4, OR BOTH.

9. If you have found that Dr. Podolnick was negligent, i.e. you have answered yes to question 1, was Dr. Podolnick's negligence a proximate cause of Elaine Brown's pain and suffering for any portion of the period of time between July 17, 1990 and April 5, 1991?
Yes _____     No _____     Vote _____

Go on to the next question.

10. If you have found that Dr. Landset was negligent, i.e. you have answered yes to question 4, was Dr. Landset's negligence a proximate cause of Elaine Brown's pain and suffering for any portion of the period of time between September 4, 1990 and April 5, 1991?
Yes _____     No _____     Vote _____

If you have answered yes and if you have also answered yes to question 9, go on to the next question; if you have answered no to both questions, cease your deliberations; if you have answered yes to either question 9 or 10 skip to question 11.

11. State in percentages your allocation as to each defendant for Elaine Brown's pain and suffering:

A. Dr. Podolnick                                             ___%

B. Dr. Landset                                              ___%

Vote _____

Go on to the next question.

12. Set forth that amount of money, expressed in a lump sum, which would reasonably compensate the Estate of Elaine Brown for her pain and suffering.

$___

Vote _____

When the jury initially returned with a verdict, the jury foreperson reported to the court that the jury answered "yes" to questions one and two by a 6–1 vote; answered "yes" to questions four, five, and six by a 7–0 vote; and answered "no" on question three by a 7–0 vote. Regarding the applicable percentages of

liability for question seven, the jury foreperson stated "A, 35 percent; B, 15 percent; C, 50 percent, and that vote was six to one." The jury foreperson reported that on question eight the jury answered 7–0 that Brown should receive $700,000 to compensate her for her reduced life expectancy. The jury foreperson reported further that the jury answered "yes" to question nine by a 7–0 vote; answered "yes" to question ten by a 7–0 vote; answered question eleven by a 7–0 vote finding that Podolnick was 20% liable and Landset 80% liable for Brown's pain and suffering; answered question twelve 7–0 compensating Brown with $50,000 for her pain and suffering.

The trial court compared the jury's "no" vote on question number three with the apportionment of liability set forth in question number seven and expressed concern. The court held a side bar conference, and then told the jury that

there's an inconsistency in the verdict. In number seven you attributed a percentage to Dr. Podolnick, and if you remember I told you, if it's not in the instructions, not written in the instruction, that you could assess a percentage on that question only if you had answered yes to all three in each grouping, that is, one, two and three about Dr. Podolnick or four, five and six for Dr. Landset. So you allocated 15 percent to Dr. Podolnick on the one hand while—on the one hand by virtue of your answer to question number three you determined that Dr. Podolnick was not responsible for reducing Elaine Brown's increased life expectancy, but then on the other hand on seven B you allocated a percentage of responsibility for that, so those two are inconsistent, so you can't do it that way.

The foreperson responded: "I think we—that was the question that we were debating for quite a while. I think we might have misinterpreted it, and the way you said it now I think maybe it's a lot clearer." The following exchange then took place:

THE COURT: Okay. Well, I have to send you back to the Juryroom to straighten that out, which I presume would mean changing around the allocation of percentages on question number seven. So you're going to have to rethink that.

THE FOREPERSON: Or changing the answer to three?

THE COURT: Or theoretically, yes, theoretically, changing to [sic] question number three. But either way it's inconsistent as it is now because it can't be both ways. So we're going to send you back to the Juryroom to debate on that a little bit further.

The jury reconsidered the questions and informed the court that it had reached a revised verdict. The jury foreperson told the

court that it "changed the answer to number three from no to yes, seven to zero." With that change, the jury now found that Podolnick's breach of the duty of care was a substantial factor in reducing Brown's life expectancy. Those votes were recorded on a verdict questionnaire sheet included in this record.

Once the court was satisfied that the verdict was consistent, it polled the jury to find out how each juror had voted on each question. The court ascertained that Juror Number Five was the sole dissenter on question one because she concluded that Podolnick did not deviate from the accepted standards of medical practice. When polled on question number two, Juror Number Five told the court, "I didn't vote on that one, did I?" There was confusion with regard to Juror Number Five's answer to question number two because the foreperson previously had reported a 6–1 vote on that question, and the court decided to poll the jury again. When the court came to question number two, Juror Number Five said, "Well, I understood that if I said no that I didn't have to answer that question. Wasn't that the way I—that's where we were before when we started over." The court commenced a sidebar conference during which defense counsel made a motion for a mistrial. The court then requested that the jury use their jury verdict forms to guide them as they were polled on each question. Continuing with question number two, the court asked Juror Number Five again how she voted, and she responded, "I didn't vote—say here—" Trying to explain her action, the following discussion took place:

MS. ZONIS:—it says, if yes, go on to next question, if no, skip to four.

THE COURT: Okay.

MS. ZONIS: Should I have voted anyway?

The court moved on to polling the jury on question number three. When the court came to Juror Number Five, the following discussion took place:

MS. ZONIS: I didn't vote on that because—

THE COURT: Okay.

MS. ZONIS:—same reason.

After the jurors were polled, and Juror Number Five's votes discounted, the resulting vote based on the polling of the jury was as follows. On question one, by a 6–1 vote the jury found Podolnick had deviated from the accepted standards of medical practice. Juror Number Five was the "no" vote. On question two, by a 6–0 vote the jury found that Podolnick's deviation increased the risk of harm. On question three, by a 6–0 vote the jury found that that increased risk was a substantial factor in reducing Brown's life. On question four, by a 7–0 vote the jury found that Landset had deviated from the accepted standards of medical practice. On question five, by a 7–0 vote the jury found that Landset's deviation increased the risk of harm posed by Brown's cancer. On question six, by a 7–0 vote the jury found that the increased risk was a substantial factor in reducing Brown's life expectancy. On question seven, with Juror Number Five voting with the majority, the jury voted 6–1 for the following apportionment of causative factors: Podolnick 15%; Landset 50%; Brown's pre-existing stomach cancer 35%. On question eight, with Juror Number Five voting with the majority, the jury voted 6–1 that Brown should be compensated $700,000 for her reduced life expectancy. On question nine, the jury voted 7–0 that Podolnick's negligence was a proximate cause of Brown's pain and suffering. On question ten, the jury voted 7–0 that Landset's negligence was a proximate cause of Brown's pain and suffering. On question eleven, the jury voted 7–0 that Podolnick was 20% liable and Landset 80% liable for Brown's pain and suffering. On question twelve, the jury voted 7–0 to award Brown $50,000 for her pain and suffering.

Defendants then requested a new trial. The trial court granted the motion and explained that the first trial was irreparably tainted by five factors: the initially inconsistent verdict; Juror Number Five's failure to vote on questions two and three; numerous objections made by the defendants to the introduction of testimony and questioning by plaintiff's counsel; comments made by plaintiff's counsel in closing arguments not supported by the evidence; and the excessiveness of the verdict.

The second trial commenced in April 1998. The eight-member jury similarly found Podolnick and Landset negligent and their negligence to constitute a proximate cause of petitioner's pain and suffering. However, the jury concluded that neither defendant was responsible for Brown's loss of a chance of cure or longer survival. The jury awarded petitioner a total of $100,000 in pain and suffering and emotional distress damages.

After the second trial, petitioner appealed in an effort to set aside the second verdict and reinstate the first verdict. While the appeal was pending, the Appellate Division sought more information from the trial court and requested that court to prepare a carefully reasoned and factually supported statement explaining why the new trial was granted. In a two-and-one-half page letter, the trial court informed the Appellate Division that it had no independent recollection of the details of the case. The trial court stated that it reviewed the transcript of its ruling on the motion for a new trial and its related notes, and believed that it was compelled to grant a new trial predominantly on the basis of incomplete jury deliberations and plaintiff's counsel's closing remarks.

The court explained that it determined that the verdict was tainted when it learned that a juror had stopped deliberating. Secondly, the court noted that it had a problem with plaintiff's counsel's comments during summation. The court stated that, prior to the commencement of trial, it had been determined that Dr. DeLaurentis would not be providing an expert opinion. Despite that understanding, the court noted that plaintiff's counsel suggested during summation that DeLaurentis believed that defendants had deviated from the standard of care. The trial court found that statement to be "unduly prejudicial" because DeLaurentis did not express that opinion at trial. As a result of that alleged impropriety, the trial court had excused the jury from the courtroom. The trial court also recalled that a disproportionate number of objections were caused by plaintiff's counsel's leading

questions. The court explained that it did not believe that counsel used leading questions deliberately, but that

> [h]is style ... forces an adversary to decide whether to make objection after objection, and risk being perceived as obstructionist by the jury, or to let it go and risk having improper testimony get before the jury. Counsel in this case chose the objection-after-objection route, and I concluded that the sheer number of such objections were some factors ... which compelled a new trial.

Based on the trial court's response, the Appellate Division denied petitioner's request to reinstate the first verdict.

## II

The New Jersey Constitution permits the Legislature to "authorize the trial of civil causes by a jury of six persons" and to mandate that such civil cases be decided by a five-sixths vote. *N.J. Const.* art. I, ¶ 9. Six-person juries are required to deliberate in a civil case unless good cause can be shown for a twelve-person jury. *N.J.S.A.* 2B:23–1(b). At least five-sixths of the jurors must render the verdict, unless the parties stipulate that a smaller majority of jurors may do so. *N.J.S.A.* 2B:23–17. Furthermore, *R.* 1:8–2(c) provides:

> Unless the parties have agreed on the record prior to commencement of deliberations to accept a verdict or finding by a lesser number, the verdict or finding shall be by agreement of five jurors when six jurors deliberate, and by 10 jurors when 12 jurors deliberate.

Even though a civil trial may consist of six jurors, a trial court may impanel as many jurors "as it deems necessary to ensure that a sufficient number of jurors will remain to deliberate." *R.* 1:8–2(d)(1). All impaneled jurors hear trial testimony, and the court may excuse any number of jurors for good cause. *N.J.S.A.* 2B:23–3; *R.* 1:8–2(d)(1). If more than the prescribed number or jurors are left on the jury at the conclusion of the case, the clerk of the court shall randomly select that number of jurors' names that will reduce the jury to the required number. *N.J.S.A.* 2B:23–3; *R.* 1:8–2(d)(1). However, more or less than six jurors may deliberate and decide the case with the consent of the parties. *R.* 1:8–2(b). Courts have allowed the participation by alternate jurors in deliberations, with consent of counsel, a practice that developed over

the years to avoid frustrating alternate jurors that hear the evidence but are excluded from deliberations. That practice is now codified in our court rules. Pressler, *Current N.J. Court Rules*, comment on *R.* 1:8–2(b) (2001). If, as in the case at bar, the jury consists of more than six jurors, the verdict "shall be by agreement of five-sixths of the deliberating jurors." *R.* 1:8–2(c)(3).

During the first trial, the court permitted eight people to deliberate in the jury room, and all parties agreed to accept a verdict from that eight-person jury. One juror was unable to complete her service, so the final verdict was rendered by seven jurors. There was no agreement among the parties that there should be a verdict percentage greater or less than five-sixths. Accordingly, when the jury was reduced to seven jurors, a valid verdict for the petitioner required six votes.

Our cases have acknowledged that each and every jury finding need not be supported by the same five-sixths of the jury. *Singer Shop–Rite, Inc. v. Rangel,* 174 *N.J.Super.* 442, 448, 416 *A.*2d 965 (App.Div.1980); *Ward v. Weekes,* 107 *N.J.Super.* 351, 258 *A.*2d 379 (App.Div.1969). Accordingly, a six member jury may vote 5–1 on a threshold jury question with one juror dissenting, and then vote 5–1 on a related subsequent jury question with a different juror casting the dissenting vote. That practice is the modern trend and is referred to as the "any majority" rule. David A. Lombardero, *Do Special Verdicts Improve the Structure of Jury Decision–Making?,* 36 *Jurimetrics J.* 275, 298 (1996). Under the "any majority rule," jurors vote on every issue irrespective of their votes on other issues. A juror's votes on different issues do not have to be logically consistent, and a plaintiff prevails if the specified number of jurors finds in his or her favor on each element of the cause of action. *Id.* at 298.

A number of states have adopted the "any majority rule." *See Perkins v. Komarnyckyj,* 172 *Ariz.* 115, 834 *P.*2d 1260, 1264 (1992); *McChristian v. Hooten,* 245 *Ark.* 1045, 436 *S.W.*2d 844, 848 (1969); *Resch v. Volkswagen of Am. Inc.,* 36 *Cal.*3d 676, 205

*Cal.Rptr.* 827, 685 *P.*2d 1178, 1181–82 (1984); *Juarez v. Superior Court,* 31 *Cal.*3d 759, 183 *Cal.Rptr.* 852, 647 *P.*2d 128, 133 (1982); *Tillman v. Thomas,* 99 *Idaho* 569, 585 *P.*2d 1280, 1282–83 (1978); *Hendrix v. Docusort, Inc.,* 18 *Kan.App.*2d 806, 860 *P.*2d 62, 67 (1993); *Young v. J.B. Hunt Transp., Inc.,* 781 *S.W.*2d 503, 504–06 (Ky.1989); *Powell v. Norman Lines, Inc.,* 674 *S.W.*2d 191, 199 (Mo.App.1984); *Naumburg v. Wagner,* 81 *N.M.* 242, 465 *P.*2d 521 (Ct.App.1970); *Sharrow v. Dick Corp.,* 86 *N.Y.*2d 54, 629 *N.Y.S.*2d 980, 653 *N.E* 2d 1150 (1995); *Schabe v. Hampton Bays Union Free School Dist.,* 103 *A.D.*2d 418, 480 *N.Y.S.*2d 328, 331 (1984); *Fields v. Volkswagen of Am. Inc.,* 555 *P.*2d 48 (Okla.1976).

This Court endorsed the rule permitting inconsistent jury votes in *Williams v. James,* 113 *N.J.* 619, 552 *A.*2d 153 (1989). In *Williams,* a plaintiff brought a slip-and-fall action against defendant-Shop Rite alleging that its negligence was the proximate cause of her injuries. In a 5–1 vote, a six-member jury found that plaintiff had no cause of action against the defendant. The following verdict sheet was submitted to the jury to guide its deliberations:

1. Was the defendant, Shop–Rite, negligent, which negligence was the proximate cause of [the injuries sustained by the plaintiff]?
   Yes _____ No _____
   Vote _____

2. Was the plaintiff, Cynthia Henry, negligent, which negligence was the proximate case of her injuries?
   Yes _____ No _____
   Vote _____

3. What percentage of fault do you attribute to:

   A. Shop–Rite _____
   B. Cynthia Henry _____

   Vote _____

[*Id.* at 621, 552 *A.*2d at 154.]

The trial court instructed the jury that it could vote inconsistently on the three questions, and said, "[e]ach question is a separate issue. Don't think you're bound because you've voted one way in a previous question and you can't vote on the next one, or you must vote consistently." *Ibid.* The jury returned a verdict finding both Shop–Rite and plaintiff negligent, that their negligence was a proximate cause of plaintiff's injuries, and apportioned fault by attributing 49% to the defendant and 51% to the plaintiff. Thereafter, it was revealed that Juror Number Two cast negative votes on the issues of negligence and proximate cause, but voted to attribute 51% of the fault to the plaintiff. Juror Number Two was the deciding vote on the apportionment issue.

In a motion for a new trial, the plaintiff claimed that the jury verdict was inconsistent because Juror Number Two's vote on fault apportionment was inconsistent with her votes on defendant's negligence. Because of that inconsistency, plaintiff argued that the court should disregard the juror's vote apportioning liability. In that event, the vote on the apportionment question would be reduced to four to one, invalidating the verdict. The trial court denied the motion for a new trial and the Appellate Division affirmed.

Although reversing and remanding for a new trial, this Court disagreed with plaintiff and held that a juror is permitted to vote inconsistently on liability and apportionment issues. The Court held that even though a juror may not find a party liable, that juror nevertheless is capable of accepting that liability is established and then determining the degree of liability by apportioning fault. A contrary result "fails to acknowledge the capacity of jurors to engage in fair and honest deliberations notwithstanding inconsistent positions even as to facts that are identical." *Williams, supra,* 113 *N.J.* at 630, 552 *A.*2d 153.

In *Williams* we acknowledged that for jurors who do not find a party at fault to engage in deliberations on the apportionment of

liability may be difficult. However, the Court concluded that that difficulty is outweighed by the benefit of full juror participation on all issues. *Id.* at 634, 552 *A.2d* 153. Pursuant to *Williams,* encouraging the deliberative process among jurors is important "because the process itself is the vehicle for the collective mutual decision-making that reflects community views." *Id.* at 632, 552 *A.2d* 153. To fulfill that goal, we emphasized in *Williams* the importance of proper jury instructions, and that each juror should be instructed to deliberate on each question. We stated that jurors

> must be told clearly and emphatically that each juror must deliberate fully and fairly on each question or special verdict, that inconsistency on the determination of one question or verdict does not disqualify a juror from deliberating on remaining questions, and that any juror must, in deliberating on any remaining question or verdict, accept the position of the majority on any previous question or verdict and do so honestly, fairly, and conscientiously.
>
> [*Id.* at 632–33, 552 *A.2d* 153.]

In *Williams,* the Court reversed and remanded the matter for a new trial because the Court found that the jury instruction failed to convey with sufficient clarity the jurors' responsibilities to engage fully in the deliberative process. Concerned that Juror Number Two voted inconsistently as a result of mistake, confusion or bias, the Court concluded that the final jury verdict could not be sustained.

Two Appellate Division cases that address the related issue of whether all jurors must deliberate on each question implicate the constitutional requirement of having at least six jurors deliberate. In *McCann v. Lester,* 239 *N.J.Super.* 601, 571 *A.2d* 1349 (App.Div. 1990), a plaintiff filed a medical malpractice claim contending that he had been misdiagnosed and negligently treated. The case was tried to a six-person jury. Five of the jurors found that the doctor was negligent, and one, James Deluce, determined that he was not. In response to the question whether the defendant's negligence was a proximate cause of the plaintiff's injuries, "five jurors voted yes, but Mr. Deluce informed the court: 'I did not answer based on my answer being no to the first [question].' " *Id.* at 605, 571 *A.2d* 1349. Concerning whether the plaintiff was negligent,

Deluce responded: " 'Again, I didn't answer that because my answers to one and three were both no.' " *Ibid.* The trial court determined that Deluce failed to adequately deliberate, set aside the verdict, and granted the motion for a new trial.

In a published opinion, the Appellate Division reversed and reinstated the original verdict. The court explained that it did not know from "the colloquy with Mr. Deluce whether or not he actually participated in the discussions following his disagreements concerning Dr. Lester's negligence." *Id.* at 608, 571 *A.*2d 1349. The court concluded that if Mr. Deluce withheld himself from discussions following the initial vote concerning negligence, the court would be faced with a situation involving the deliberation of a five-member jury. In such a case, the court held that *R.* 1:8–2(c) should govern and a "verdict may be rendered by 5 of the jury agreeing." *Ibid.* The court also stated that it would not matter if Mr. Deluce participated fully in the deliberations because his vote was not necessary to the verdict. Therefore, the court held that "where the dissenting juror's vote was unnecessary ... the lack of a *Williams* charge or an indication whether or not the dissenting juror participated in future deliberations does not disqualify the valid verdict rendered by the remaining five jurors." *Id.* at 609, 571 *A.*2d 1349.

In *Petrolia v. Estate of Nova*, 284 *N.J.Super.* 585, 666 *A.*2d 163 (App.Div.1995), another Appellate Division panel criticized the *McCann* result "[t]o the extent that [*McCann* ] suggests that five jurors alone can deliberate and render a valid verdict." *Id.* at 592, 666 *A.*2d 163. In *Petrolia,* the plaintiff sought a mistrial in a medical malpractice/informed consent cause of action that was tried to a verdict adverse to the plaintiff, claiming that the trial court failed to require a new trial because the deliberating jury had only five members. *Id.* at 589, 666 *A.*2d 163. Eight jurors were impaneled for the trial, but over the course of the trial the jury was reduced to five. Noting that *R.* 1:8–2(c) provides that if a jury of six is impaneled, the parties shall be deemed to have stipulated that a verdict may be rendered by five of the jurors

agreeing, the defendant contended that the underlying rationale of the rule "compels a determination that the rule applies to an impaneled jury of any number that is governed by the five-sixths majority." *Id.* at 591–92, 666 *A.*2d 163. The defendant contended that a party desiring to assure a trial by no less than six jurors must so state before any jury of more than six is drawn, impaneled and sworn. *Id.* at 592, 666 *A.*2d 163. Rejecting the defendant's contention, the Appellate Division explained that *R.* 1:8–2(c) applies only where six jurors are initially impaneled, and not when a jury is reduced to six members. According to the court, the rule was adopted before alternate jurors routinely were impaneled. *Id.* at 590, 666 *A.*2d 163. Furthermore, the court stated that although agreement of five jurors is necessary to return a verdict, "the presence of a sixth juror during deliberations may make a difference." *Id.* at 592, 666 *A.*2d 163. The court concluded that the verdict was not valid because only five jurors deliberated.

We need not address the apparent conflict between *McCann* and *Petrolia* because those cases focus primarily on whether a party received the benefit of the constitutional right to a six-person jury. In this appeal the parties stipulated to an eight-member jury and that all jurors would participate in the deliberations and vote. The verdict was eventually rendered by a seven-member jury that was asked to answer twelve interrogatories. Every determination on the verdict sheet was supported by at least six votes, the required minimum for a seven member jury.

### III

We address in order the validity of the grounds advanced by the trial court to support its grant of a new trial.

#### A. *An Inconsistent Verdict*

■ One of the grounds relied on by the trial court in invalidating the verdict at the first trial was that the original verdict was inconsistent. The trial court expressed concern that on question number three the jury found that Podolnick's negligence was not a

"substantial factor" in decreasing Brown's life expectancy, but found him 15 percent liable for Brown's "loss of chance" for a cure or longer survival. The court sent the jury back to the jury room to rectify that inconsistency. When the jury returned, the jury foreperson reported to the court that, by a 7–0 vote, the jury found that Podolnick's negligence *was* a substantial factor in decreasing Brown's life expectancy. In granting a new trial, the trial court stated that the jury's response was "a problem." The Appellate Division disagreed, observing that the jury was free to change its vote before the verdict was accepted.

The Appellate Division clearly is correct. After being told that the jury verdict was inconsistent, the trial court instructed the jury that it either could change the allocation of percentages on question seven or, alternatively, change its answer to question three. The jury followed the court's instruction and returned with a new verdict that corrected the response to question three. Even though the jury's original verdict was inconsistent, the trial court appropriately reinstructed and resubmitted the questions to the jury "to assur[e] consistent answers accurately reflecting the jury's findings." *Roland v. Brunswick Corp.*, 215 *N.J.Super.* 240, 244, 521 *A.*2d 892 (App.Div.1987) (citations omitted). We hold in high regard the capacity and integrity of juries, and have no doubt that the original jury was capable of following the trial court's curative instruction. *See State v. Koedatich,* 112 *N.J.* 225, 282, 548 *A.*2d 939 (1988); *State v. Winter,* 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984). "We have similar high expectations of jurors who are instructed to begin deliberations anew after they have already engaged in deliberations ... or to disregard prior determinations in readdressing issues." *Williams, supra,* 113 *N.J.* at 632, 552 *A.*2d 153 (citations omitted).

The federal rules provide a similar remedy for inconsistent verdicts. Under *Fed.R.Civ.P.* 49(b), a district court may return the verdict to the jury for further consideration of its answers and verdict, or it may order a new trial. *See* Wright & Miller, *9A Fed.Prac. & Proced.Civ.2d* § 2513 (1995). The choice between

those two options should reflect the confidence that the court has in the jury's ability to correct the inconsistency without compromising the fairness of the process. *Ibid.* In addition, the federal rule grants the trial court broad discretion in resolving any inconsistencies between the interrogatory answers and the general verdict, and the interrogatory answers themselves. Stephen S. Korniczky & Don W. Martens, *Verdict Forms—A Peek Into the "Black Box,"* 23 *AIPLA Q.J.* 617, 625 (Fall 1995). The trial court "must make every attempt to harmonize the jury's answers to the interrogatories under a fair reading of the jury's answers to determine whether they are consistent." *Id.* at 626–27 (footnotes omitted).

We are fully satisfied that the trial court remedied the inconsistency in the initial verdict sheet by properly sending the jury back to the jury room for further deliberations.

B. *Failure of Juror Number Five to Deliberate on Two Interrogatories*

The Appellate Division stated that, apart from the reasons articulated by the trial court for requiring a new trial, the failure of one juror to deliberate on all issues violated *Williams* and itself required a new trial. We disagree.

The record indicates that although the foreperson reported that Juror Number Five voted on all questions, Juror Number Five stated that she did not "answer" two interrogatories because the verdict sheet instructed her not to do so. Question number one read, "Did defendant Dr. Podolnick deviate from the accepted standards of medical practice?" Following that question, the verdict sheet stated, "If yes, go on to the next question; if no, skip to question 4." Question number two read, "Did defendant Dr. Podolnick's deviation increase the risk of harm posed by Elaine Brown's stomach cancer?" Following that question, the verdict sheet stated, "If yes, go on to the next question; if no skip to question 4."

The Appellate Division noted the ambiguity in that instruction and said, "the sample jury verdict form and its accompanying instruction should make clear the distinction between the individual 'you' and the collective 'you' which led to this problem." That court observed that "the trial judge could have sent the jury back to deliberate with a full instruction after Juror 5 indicated her failure to participate on several questions. Had he done so, the problem presented could have been remedied." *Id.* at 9. We believe, as did the Appellate Division, that if the trial court was concerned that the verdict sheet caused a juror not to answer certain interrogatories, the court should have sent the jury back for further deliberations.

Moreover, the record does not reveal the extent to which Juror Number Five actually participated in the jury deliberations on questions two and three, but it does reflect that she was substantially involved in the entire deliberative process. Juror Number Five voted on question number one, answering that Podolnick did not deviate from the accepted standard of medical care. She stated that she did not answer questions two and three that ask respectively whether Podolnick's deviation increased the risk of harm posed by Brown's cancer and whether the increased risk was a substantial factor in reducing Brown's life expectancy. As noted, the jury foreperson's report to the trial court, in contrast to Juror Number Five's recollection, was that the initial vote on question two was 6–1, the initial vote on question three was 7–0 in the negative, and the corrected vote on question three was 7–0 in the affirmative.[2] Thus, according to the foreperson's report, Juror Number Five *did vote* on questions two and three, which report in that respect is consistent with the jury verdict sheet included in the record. Furthermore, Juror Number Five voted on all remaining questions, including question number seven that apportioned damages resulting from defendants' negligence. Even

---

[2] We note that on the verdict questionnaire sheet the foreperson entered a 6–1 vote in the affirmative for question number three, contrary to his recollection in court that the vote was 7–0.

though Juror Number Five found that Podolnick was not negligent, she voted for a 15% apportionment of liability against him for Brown's "loss of chance" of survival or a cure.

Because Juror Number Five voted in favor of apportioning liability to Podolnick, we can reasonably infer that she participated to some extent in the jury's discussion of questions two and three, because her vote on apportionment required her to consider the extent of harm caused by Podolnick's negligence. Accordingly, it can fairly be said that Juror Number Five's deliberations on the apportionment of liability to Podolnick implicated to some extent deliberation on the question whether Podolnick's negligence was a causative factor in reducing Brown's life expectancy. We also note that Juror Number Five voted and deliberated on pain and suffering damages, finding that Podolnick's negligence was the proximate cause of Brown's pain and suffering and allocating 20% of the liability to Podolnick and 80% to Landset. That finding by Juror Number Five also required her to deliberate on causation in regard to Podolnick in order to determine his share of responsibility for pain and suffering damages.

In addition, when reporting the vote count on questions two and three, the jury foreperson told the court that the vote was 6–1 on question two and 7–0 on question three. A jury member explained to the court that when the jury voted, "[w]e kind of just raised our hands and he recorded them all on the sheet." Because Juror Number Five's votes were recorded by the jury foreperson, we can reasonably infer that the foreperson understood Juror Number Five's position that Podolnick was not negligent and that his negligence was not a proximate cause of Brown's injuries, even though she informed the court that she did not vote on those questions.

Although we do not know the precise extent of the jury's deliberations on each question, petitioner nevertheless received the statutorily and constitutionally-required number of votes for a valid verdict. By a 6–1 vote, the jury found that Podolnick was negligent. By a 6–0 vote, the jury found that his negligence was a

proximate cause of reducing Brown's life expectancy. By a 7–0 vote, the jury found that Landset was negligent and that his negligence was a proximate cause of reducing Brown's life expectancy. By a 6–1 vote, Juror Number Five voting with the majority, the jury apportioned liability between the two defendants and found that Brown should be compensated $700,000 for her reduced life expectancy. By a 7–0 vote, the jury found that Brown should be awarded $50,000 in pain and suffering damages. Therefore, petitioner received a statutorily and constitutionally valid verdict.

In *Williams*, we held that jurors should deliberate on every question irrespective of how they voted on previous questions. We emphasized that a court must convey to the jurors their responsibilities with sufficient clarity, and stated:

> A trial court in presenting special interrogatories or eliciting special verdicts from a jury must specifically instruct the jury that each juror must determine and decide each question, that a juror is not required to vote consistently on each question and may vote inconsistently on questions, that each juror must consider each question with an open mind, that each juror must determine each question fairly and impartially based on the evidence, and that it is proper to accept the determination of at least five of the jurors on any question when that determination is relevant or essential in deciding another question.
>
> [*Williams, supra*, 113 *N.J.* at 633, 552 *A.*2d 153.]

We thus held that a juror cannot be precluded from voting on issues of damages even if he or she previously had found no liability. We did not address in *Williams* the consequences of a juror not voting on a specific interrogatory. In our view, the evidence in this record persuasively argues against a rule of automatic reversal and suggests instead that the better rule is to consider the issue in the context of specific facts.

Based on this record, we are satisfied that reversal of the first trial verdict based on a juror's alleged failure to vote on two questions concerning causation is inappropriate and unjust. The trial court had the opportunity to send the jury back for further deliberations once it was informed that she had been confused by the ambiguous verdict sheet. The court failed to do so. In addition, Juror Number Five's answers to the other interrogato-

ries reflect her substantial participation in deliberations concerning Podolnick's causal responsibility. Although she found Podolnick not negligent, she voted with the majority of jurors 6–1 to apportion liability against him, and also voted with the majority to hold Podolnick liable for pain and suffering and on the apportionment of his liability for those damages. Even if the court had sent the jury back to deliberate further in order to require Juror Number Five to vote on questions two and three, we are satisfied that the outcome would not have been any different. Finally, there was no constitutional violation. Petitioner had a jury of more than six members and received the statutorily and constitutionally required five-sixths vote on each question.

Accordingly, we are satisfied that in the context of this record reversal of the first trial jury verdict based on Juror Number Five's alleged failure to vote on questions two and three would constitute a miscarriage of justice.

### C. Plaintiff's Counsel's Conduct at Trial

One of the reasons offered by the trial court to support the grant of a new trial was that plaintiff's counsel's conduct at trial was "disturbing." The Appellate Division did not address that issue because it stated that the failure of a juror to deliberate on all issues itself justifies a new trial. The court stated that the trial court acted within its discretion to order a new trial based on its "feel" of the case. The trial court explained that throughout the trial there was constant interruption, and the jury had to be excused while the lawyers resolved certain issues. The court also expressed frustration with plaintiff's counsel's demeanor. For example, the court observed that plaintiff's counsel was "constitutionally incapable of asking proper questions" and had an inability to understand what the witnesses had testified to. In addition, the court made a specific reference to plaintiff's counsel's questioning of Dr. Befeler, his expert witness. The court stated that when it asked plaintiff's counsel what Befeler was going to testify

to, plaintiff's counsel erroneously commented that the information was in Befeler's report or deposition.

■ Based on our careful review of the record, we find no credible evidence that plaintiff's counsel behaved improperly and acted in a manner to distract or confuse jurors. Throughout the entire ten-day trial, the jury was dismissed only five times as a result of defense counsel's objections. Four of the five dismissals coincided with scheduled breaks. Furthermore, the jury was excused during Befeler's testimony only on two occasions. Without the benefit of side-bar transcripts, we are unable to determine whether plaintiff's counsel improperly allowed Befeler to testify about information not contained in his deposition or expert report. We note that the thrust of defense counsel's objections to the interrogation of Befeler is unclear and that the trial court was unaware that the side-bar conferences were not being recorded. We assume that if they had been recorded, they would reveal more detail concerning the basis for defense counsel objections to Befeler's testimony.

We also note that the court specifically instructed the jury that counsel's objections should not be a factor in its deliberations. The court explained that lawyers have a duty to make objections when appropriate, and that that function should not affect the jury's deliberations about the evidence adduced at trial. We find scant support in the record to sustain the grant of a new trial on the basis of plaintiff's counsel's alleged misconduct during the interrogation of Befeler.

■ The court also cited plaintiff's counsel's conduct during closing arguments as a basis for granting a new trial. The court noted that plaintiff's counsel improperly suggested to the jury that Dr. DeLaurentis, the surgeon who operated on Brown's stomach, testified to the appropriate standard of care although he was not offered as an expert witness. The court noted that as a result of plaintiff's counsel's improper conduct the jury had to be dismissed during plaintiff's counsel's summation.

Our review of the record reveals that the jury was not dismissed during plaintiff's counsel's closing argument. In addition, plaintiff's counsel did not assert in his summation that DeLaurentis' testimony was to be considered in determining whether defendants deviated from the standard of care. On the contrary, DeLaurentis was a fact witness, and during plaintiff's counsel's summation he reminded the jury that DeLaurentis first diagnosed Brown's mass and recommended immediate surgery. Counsel's closing remarks appropriately focused on trial testimony in which DeLaurentis described in detail how he was able to identify Brown's cancerous mass.

Furthermore, the court delivered the following curative jury instruction:

I'm instructing you that you are not to consider his testimony for the purpose of determining whether there was a deviation or whether there was not a deviation. He came here simply to tell us what he did and what he found when he did his operation. So please, I'm instructing you, you are not to consider his testimony. . . .

Moreover, the court informed the jury that statements made by lawyers during closing arguments are not testimony, and that the jury is to rely on their own independent recollection of trial testimony. We are fully persuaded that plaintiff's references to DeLaurentis' testimony during summation could not support the grant of a new trial.

D. *The Amount of the Verdict*

█ The court stated that it granted a new trial because it found the verdict amount to be "shockingly high." Our cases emphasize that a jury verdict should not be disturbed "unless it constitutes a manifest injustice that shocks the judicial conscience." *Carey v. Lovett,* 132 *N.J.* 44, 66, 622 *A.*2d 1279 (1993); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 596–97, 379 *A.*2d 225 (1977); *Morris v. Krauszer's Food Stores,* 300 *N.J.Super.* 529, 541, 693 *A.*2d 510 (App.Div.1997); *Adams v. Cooper Hosp.,* 295 *N.J.Super.* 5, 13–14, 684 *A.*2d 506 (App.Div.1996); *Tronolone v. Palmer,* 224 *N.J.Super.* 92, 97, 539 *A.*2d 1224 (App.Div.1988). Moreover, a

court should set aside a jury verdict only if it determines that the award is inadequate or excessive by viewing the evidence in the light most favorable to the non-moving party. *Caldwell v. Haynes*, 136 *N.J.* 422, 432, 643 *A.*2d 564 (1994).

■ We conclude that the trial court erred in sustaining the grant of a new trial on the ground that the verdict was excessive. Despite testimony that the decedent was ill before she consulted defendants, six jurors concluded that both defendants failed to diagnose and treat her in a manner that would have prolonged her life. Plaintiff's expert Dr. Befeler told the jury that Brown was deprived of the potential for a cure of her cancer, and the chance for a longer life, because she was denied an early diagnosis. Befeler explained that early diagnosis for gastric malignancies is mandatory because cancer spreads gradually, and once cancer spreads throughout the body the condition cannot be cured. Befeler told the jury that by the time DeLaurentis had operated on Brown, her condition was not curable. Furthermore, on cross-examination, defendants' expert Dr. Engstrom acknowledged that if patients with stage one stomach cancer are diagnosed early enough, "those patients can be cured," and can go on to live many years longer. Based on this record, we believe that the $700,000 jury award was not excessive, and are convinced that it does not "shock" the judicial conscience.

Furthermore, the $50,000 award for the decedent's pain and suffering was not excessive. At trial, the jury heard Brown's deposition taken before her death describing how she suffered through severe pain. Jurors heard how doctor after doctor failed to diagnose Brown and, out of desperation, Brown told her husband, "if someone didn't do something soon I was going to pack my suitcase and walk into the first hospital in Philadelphia and tell them I was sick." Jurors also heard testimony from Brown's son and best friend, who both described the severity of Brown's pain in the upper left quadrant of her stomach. Based on this record, we are unpersuaded that the $50,000 in pain and suffering damages is excessive.

## IV

We conclude that none of the grounds relied on by the lower courts justified the grant of a new trial and that the trial court's reasons for granting a new trial are without merit. Accordingly, we reverse the judgment of the Appellate Division and reinstate the verdict in favor of plaintiff rendered at the first jury trial.

VERNIERO, J., dissenting.

Stripped to its essence, this case requires us to determine whether "[t]he jury's verdict [in the first trial] is worthy of the confidence of this Court." *State v. Nelson*, 155 *N.J.* 487, 532, 715 *A.*2d 281 (1998) (Coleman, J., concurring in part and dissenting in part), *cert. denied*, 525 *U.S.* 1114, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999). In the past, we have set aside verdicts that have not engendered our confidence because of flaws in the jury deliberation process. One example is found in *Tobia v. Cooper Hospital University Medical Center*, 136 *N.J.* 335, 643 *A.*2d 1 (1994). In that case, also a medical malpractice action, we set aside a verdict favorable to the defendants because jurors may have improperly focused on the plaintiff's conduct rather than on whether the defendants were negligent. In so doing, we observed that the "possibility [of that juror error] so undermines our confidence in the jury's verdict as to compel us to reverse and remand for a new trial." *Id.* at 344, 643 *A.*2d 1.

Here, we are confronted not with a "possibility" of juror error, but rather the clear admission by one juror that she failed to vote on the two questions that related to whether Dr. Podolnick's conduct increased the risk of harm to Mrs. Brown. Those questions were at the heart of this case. Before that error became apparent, the trial court discovered that the jury as a whole had rendered an inconsistent verdict by attributing a percentage of negligence to Dr. Podolnick while, at the same time, finding him not responsible for reducing Mrs. Brown's life expectancy.

In its opinion below, the Appellate Division outlined the public policy favoring the full participation of all jurors:

The main reason why the deliberation of all jurors on all issues is necessary is that a jury's decision is not final until its conclusion is submitted to and accepted by the judge. Up until that point it is merely a tentative agreement among the jurors subject to change. Until a final verdict is rendered, the jurors may reconsider any or all of the issues. Thus, for example, a jury may begin its deliberations by concluding that both of two defendants in a tort case are liable and then, in allocating percentages of negligence, determine that one, in fact, is not liable at all. This is why the participation of all jurors, including those dissenting on initial questions, is of importance right up until the return of the verdict.

[footnote and citation omitted.]

I am guided by similar reasoning found in *Petrolia v. Estate of Nova,* 284 *N.J.Super.* 585, 666 *A.*2d 163 (App.Div.1995), *certif. denied,* 143 *N.J.* 516, 673 *A.*2d 276 (1996), a decision the majority declines to endorse. The *Petrolia* court expressed its preference for full jury participation, observing that " 'numerous recent studies have demonstrated that the quality of the jury's discussion and deliberation is better in larger groups than in smaller ones.' " *Id.* at 592, 666 *A.*2d 163 (quoting Richard S. Arnold, *Trial by Jury: The Constitutional Right to a Jury of Twelve in Civil Trials,* 22 *Hofstra L.Rev.* 1, 31 (1993)). The failure of jurors to fully participate mars the deliberation process, causing all litigants and the system as a whole to suffer.

In the present case, the parties stipulated to the participation and deliberation of all eight members of the jury. Both sides were aware of the potential loss of the eighth juror due to a scheduling conflict. In the event of that loss, the parties expected that the seven remaining jurors would participate and vote on all questions.

As I interpret the record, that expected participation of the seven jurors simply did not occur. The record indicates that one juror, Juror Number Five, did not vote on questions two and three. When asked by the trial court how she voted on question two, Juror Number Five stated, "I didn't vote[.]" She responded similarly when asked how she voted on question three. By my reading of the record, Juror Number Five believed that having decided in a previous question that Dr. Podolnick did not deviate from the accepted standards of medical practice, there was no

need for her to vote on questions two and three. When polled, she told the court, "I understood that if I said no [to question one] that I didn't have to answer [question two].... [I]t says ... if no, skip to four." In view of those statements, I am unable to conclude with confidence that Juror Number Five answered or deliberated on all questions.

Moreover, the abstention of that juror frustrated the mutual expectations of the parties. Juror Number Five's failure to answer all questions diminished the accuracy of the process. Thus, the trial court was well justified in basing, at least in part, its grant of a new trial on that error. In hindsight, we also have the benefit of knowing that a second jury trial yielded a verdict with no apparent juror error. (That second jury also awarded damages to plaintiff, although the amount was less than the first jury's award.)

The trial court identified other problems with the first trial. Specifically, the court perceived error in the way plaintiff's counsel conducted himself at closing and elsewhere in the proceedings. The trial court's perceptions are entitled to greater deference than that afforded by the majority. "An appellate court should give considerable deference to a trial court's decision to order a new trial, as the trial court has gained a 'feel of the case' through the long days of the trial." *Lanzet v. Greenberg*, 126 *N.J.* 168, 175, 594 *A.*2d 1309 (1991).

The Court acknowledges that, without the benefit of side-bar transcripts, its ability to review some aspects of the proceedings is circumscribed. *Ante* at 227–28, 773 *A.*2d at 1116. That acknowledgment only fortifies my view that we should defer to the trial judge who *was* present during all side-bar conversations and thus was in the unique position to pass on the propriety of defendants' objections.

Although, as the majority correctly notes, the trial court did not dismiss the jury during the summation of plaintiff's counsel, *ante* at 228, 773 *A.*2d at 1116–17, the court did, in fact, dismiss the

jurors after that summation was completed in response to objections by defense counsel. The record indicates:

(Jury present)

THE COURT: Members of the jury, if you want to stand up for just a minute and stretch your legs, rather than—you don't have to stand up, you can if you want to. Just for a minute if you want to while I gather my papers together here.

(Pause)

DEFENSE COUNSEL: Judge, may we be heard briefly before you start the charge? There are some motions that may affect the charge.

THE COURT: All right. I guess you'll have to go back to the jury room.

PLAINTIFF'S COUNSEL: Do you want to try it at sidebar, Judge?

THE COURT: No. No. Please don't start to talk about it yet. We'll call you back in as soon as we're ready.

(Jury out)

Once it dismissed the jury, the court entertained defendants' lengthy objections to the summation of plaintiff's counsel, including an objection to counsel's comments regarding the testimony of Dr. DeLaurentis. One defense counsel remarked, "Judge, I have never in all the years I've been doing this . . . seen what I deem to be totally inappropriate comments made in closing as I have this morning." The court seemed to agree, stating to plaintiff's counsel: "Well, actually, . . . you said a lot of things during your closing which were not my recollection of how the facts came out during the course of the trial[.]"

Nonetheless, the court denied defendants' motion for a mistrial, stating "[w]e'll get through this, we'll see what the jury has to say and then we'll have our post-trial motions and whatever happens after that, happens." The trial court then called for the jury. Because the jury apparently had been dismissed on numerous other occasions, the court assured jurors on their return, "I promise you that's the last of the delays because this is the end of it. There will be no more delays."

Referring to that last dismissal of the jury (the dismissal that followed the summation of plaintiff's counsel), the judge observed

in his statement to the Appellate Division: "I recall [that there] was a problem with [the] comments [of plaintiff's counsel] during his summation. I remember that, upon an objection being interposed, I excused the jury for a discussion out of their hearing. I have never done that before or since in almost 18 years on the trial bench."

We should heed those strong words of the trial court. Although I might agree with the majority's ultimate conclusion that plaintiff's counsel did not act improperly, "we [should] not substitute our judgment for the judgment of those closest to the trial when it appears that they have acted reasonably under the circumstances." *State v. Zhu*, 165 *N.J.* 544, 555, 761 *A*.2d 523 (2000). A trial court's rulings concerning confusion on the part of jurors or the conduct of trial counsel fall squarely within the category of those decisions warranting a high level of deference.

In sum, Juror Number Five conceded that she misunderstood the verdict sheet and did not vote on two critical questions. That irregularity was contrary to this Court's teaching that "each juror must deliberate fully and fairly on each question or special verdict[.]" *Williams v. James*, 113 *N.J.* 619, 632, 552 *A*.2d 153 (1989). The trial court appeared deeply troubled by the jury's verdict and identified other problems concerning the first trial. The second verdict rendered by a different jury was apparently free of any juror confusion or similar error. In view of those problems concerning the first trial and verdict, I would not disturb the second verdict. Thus, I respectfully dissent.

JUSTICE LaVECCHIA joins in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices STEIN, COLEMAN and ZAZZALI—4.

*For affirmance*—Justices VERNIERO and LaVECCHIA—2.